Moses MEEKS, Jose Lopez, Emitt Barge, George Butler, Carl Hutchinson, George Washington, Gloria Kaplanos, Administratrix of the Estate of Bill Gianopoulos, Plaintiffs-Appellants,

v.

Douglas M. GRIMES, individually and as Judge of the Gary City Court of Gary, Indiana; Office of the Gary City Court of Gary, Indiana; Common Council of the City of Gary and its Individual Members, Defendants-Appellees.

No. 85–1176.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 24, 1985.

Decided Dec. 19, 1985.

James J. Frank, Gary, Ind., for plaintiffs-appellants.

Alton L. Gill, Jr., Dept. of Law, City of Gary, Gary, Ind., for defendants-appellees.

Before WOOD and FLAUM, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

FLAUM, Circuit Judge.

Plaintiffs-appellants are former bailiffs of the Gary City Court of Gary, Indiana who claim that they were terminated for their political activities in violation of the First and Fourteenth Amendments as interpreted in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Following a bench trial the district court ruled in favor of the defendants and plaintiffs appealed to this court. Finding there to be insufficient evidence that these bailiffs fall within the exception to the First Amendment's protections for positions where political affiliation is a bona fide job criterion we reverse and remand for further findings.

I.

Plaintiffs were employed as bailiffs of the Gary City Court by Judge Fredrick T. Work and served under him until the end of the judge's second four-year term in 1979. The Gary City Court consists of one elected judge who presides over both the criminal and civil divisions of the court. The court employs a number of referees who take responsibility for hearing unspecified types of cases. Under Indiana law the bailiffs of this type of local court are appointed by the judge under whom they

serve. The law further provides that bailiffs are "at will" employees who serve at the pleasure of the employing judge. In essence, the bailiffs' position is a classic example of a patronage appointment given to an elected official.

As the 1979 election drew near Judge Work decided not to seek a third term, throwing the Democratic party, of which he was a member, into a factional battle. The nature of Gary politics at the time was such that the person prevailing in the Democratic primary was assured victory in the general election. In the 1979 primary, the defendant, Douglas Grimes, who ran and lost to Judge Work in 1975, ran against Lloyd B. Fisher, who had the active support of Judge Work and the plaintiffs-bailiffs. Following a hard-fought primary that generated "considerable ill will" between elements of the Democratic party, the defendant prevailed and took the oath of office on January 7, 1980. On the same date all the plaintiffs were discharged from their positions with the court. The bailiffs proceeded to file this § 1983 action against Judge Grimes, individually, and the Gary City Court praying for damages and injunctive relief for alleged violations of the plaintiffs' First and Fourteenth Amendment rights.

Trial was held before Judge Kanne, who after hearing all the testimony ruled in favor of the defendants. The court found that the plaintiffs were discharged solely because of their political activities in opposition to Judge Grimes but that the defendants' action was privileged under *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). The lower court held that the plaintiffs were "policymaking or confidential" employees within the recognized exception to the First Amendment prohibition against politically motivated patronage discharges. Judge Kanne, while finding that bailiffs were not policymakers, ruled that bailiffs were as a practical matter almost always confidential employees. This conclusion was based on: (1) the fact that the bailiffs are viewed as the judge's representatives in public and thus must have the complete confidence of the judge in order to avoid ethical problems and maintain the public's perception of the court; (2) the bailiffs' access to confidential communications and records; (3) the difficult working condition engendered by the natural animosity resulting out of political opposition.

## II.

At the outset, we find no reason to disturb the district court's finding that the dismissal of the plaintiffs was politically motivated. This determination was based on the credibility of the testimony heard at trial coupled with the strong circumstantial inference arising from the close temporal proximity of the defendant's assumption of office and the dismissals. In these circumstances an appellate court's review is very limited; we will not disturb the trial court's factual findings absent a definite and firm conviction that a mistake has been committed. *See* Fed.R.Civ.P. 52(a). *See also O'Toole v. New York Life Insurance Co.*, 671 F.2d 913 (5th Cir.1982); *Wattleton v. International Brotherhood of Boiler Makers*, 686 F.2d 586 (7th Cir.1982), *cert. denied*, 459 U.S. 1208, 103 S.Ct. 1199, 75 L.Ed.2d 442 (1983). The defendants have presented no arguments on appeal which undermine our faith in Judge Kanne's factual determination. This leaves this appeal with one crucial issue: whether the bailiffs are policymaking or confidential employees and thus subject to patronage discharge.

### A.

As was recognized by the Court in *Elrod*, patronage is a reality of American politics which almost invariably comes into conflict with the protections provided the government employee under the First Amendment. 427 U.S. at 353–56, 96 S.Ct. at 2679–81. The judicial attempt at dealing with this tension is a rough balance between governmental efficiency, political reality, and individual liberty. *See, e.g., Shondel v. McDermott*, 775 F.2d 859, 864 (7th Cir.1985); *Tomczak v. City of Chica-*

*go,* 765 F.2d 633, 640–41 (7th Cir.1985). As the doctrine has evolved from its initial enunciation in *Elrod* the problems faced by the courts in applying the formulation have become increasingly intractable. This is the natural product of the fact that, not only do job classifications and personalities vary in each case, but also there are substantial differences between governmental bodies and between individual departments or units within a given governmental body. Quite simply, it is difficult to compare the Gary City Courts to the City of Chicago or to a two person state's attorney's office in a rural community. Given this background we find it necessary to re-examine the doctrine of patronage dismissals as it is applied to certain small governmental units.

In finding that the sheriff of Cook County could not discharge certain bailiffs and process servers, a plurality of the Supreme Court in *Elrod* held that "a *non-policy-making, nonconfidential* government employee can [not] be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs." 427 U.S. at

375, 96 S.Ct. at 2690 (Stewart, J. concurring). (Since Justice Stewart's concurrence was necessary to constitute a majority his opinion has often been read as the opinion of the Court, *see Tomczak,* 765 F.2d at 640; *Stegmaier v. Trammell,* 597 F.2d 1027, 1033–34 (5th Cir.1979).) The opinion was read to establish a definitional-categorizational test whereby the protection accorded the plaintiff was based on whether the office held could be found to be a "policymaking" or "confidential" position. *See Stegmaier* at 1034; *Ness v. Marshall,* 660 F.2d 517, 520 (3d Cir.1981).

Four years later in *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) the Supreme Court moved away from the policymaking and confidential labels and towards a more functional analysis. "[T]he question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the office involved." 445 U.S. at 518, 100 S.Ct. at 1294. (It should be noted that the focus here is on the office or position rather than the individual officeholders.[1] *See Nekolny v.*

---

1. At trial there was substantial disagreement over the role of the bailiff in the Gary City Court. Judge Work testified that the bailiffs' duties consisted primarily of courtroom security and/or "field work" including process serving. Judge Grimes claimed in response that he had plans for an increased role for the bailiffs and that the nature of the plaintiffs' office under his administration should not be extrapolated from the practice under a former judge. There is no question that a new officeholder can revamp the organization he controls and convert a ministerial position into one closer to the core of the policymaking process. However, our focus is on the "inherent powers" of the office, not what any individual officeholder actually does.

*Elrod* and *Branti* require examination of the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office. *Ness v. Marshall,* 660 F.2d 517, 522 (3d Cir.1981); *Alfaro de Quevedo v. De Jesus Schuck,* 556 F.2d 591, 593 n. 4 (1st Cir.1977); *Mummau v. Ranck,* 531 F.Supp. 402, 405 (E.D.Pa.1982), *aff'd,* 687 F.2d 9, 10 (3d Cir.1982). Thus, if an officeholder performs fewer or less important functions than usually attend his position, he may still be exempt from the prohibition against political terminations if his position inherently encompasses tasks that render his political affiliation an appropriate prerequisite for effec-

tive performance. In this court's reiteration of the *Branti* formulation, we emphasized the functions of the office involved, not the officeholder: "The test is whether the position held by the individual authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." *Nekolny v. Painter,* 653 F.2d 1164, 1170 (7th Cir.1981) (emphasis added), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982). The unarticulated purpose behind this approach seems to be two-fold: first, to resolve the issue entirely in one proceeding, thereby relieving the courts of the burden of having to reexamine a certain position every time a new administration changes the mix of responsibilities bestowed upon the officeholder; and, second, to provide certainty to litigants. *Tomczak v. City of Chicago,* 765 F.2d 633, 640–41 (7th Cir.1985). Therefore barring some radical transformation that goes to the core of the nature of the position, the district court need not concern itself with what past or present administrations have done with the office.

Furthermore, each of the plaintiffs was in a different situation; some were in the criminal division while others worked in the civil area and some were assigned to courtrooms while

*Painter,* 653 F.2d 1164, 1170 (7th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982).) While *Branti* establishes the line of central inquiry in political discharge cases, *see Soderbeck v. Burnett County,* 752 F.2d 285, 288 (7th Cir. 1985), it would be erroneous to say that the policymaking and confidential categorizations are no longer useful. "Policymaking" and "confidential" do accurately describe the vast majority of offices that fall within the realm of legitimate patronage under the *Branti* formulation.

Policymaking type positions, as broadly defined by this court, *see Nekolny,* 653 F.2d at 1169–70, are invariably offices for which political affiliation is a legitimate job criterion. In *Nekolny v. Painter* we held that an "employee's position is unprotected if, first, there is room for principled disagreement in the decisions reached by the employee and his superiors, and, second, he has meaningful direct or indirect input into the decision making process." *Tomczak,* 765 F.2d at 641 (describing the holding in *Nekolny,* 653 F.2d at 1170). This is derived from the fact that the First Amendment's protections must reflect political reality; "[t]hus, if an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency." *Branti,* 445 U.S. at 517, 100 S.Ct. at 1294 (citing *Elrod,* 427 U.S. at 366, 96 S.Ct. at 2686). The bailiffs here could

not be considered to be decisionmakers within the scope of our decisions in *Nekolny* or *Tomczak* and the district court so held. To the extent the record reveals anything, it establishes that the bulk of the plaintiffs' responsibilities consisted of process serving and courtroom security; these are duties that are classically ministerial as opposed to discretionary.

Thus our attention turns to the second type of office for which politics is a constitutionally permissible job criterion; these positions can be generally described as "confidential." This is a catchall phrase that encompases those government employees who, while not decision makers, are in close contact with policymakers and the highly confidential communications or records affecting decisions. *See Soderbeck,* 752 F.2d at 288 ("You cannot run a government with officials who are forced to keep political enemies as their confidential secretary . . . ."). The basis for exempting this type of employee is that political antipathy can serve as a decent proxy for a lack of trust and loyalty where the employee's responsibilities include a duty to shield the decisionmaking process from the outside world. The possibility of "leaks" from employees with access to sensitive information is a constant threat to any unit of government.

On the record before us it is impossible to conclude that these bailiffs were confidential employees. Nor is it possible to state categorically that bailiffs are confidential employees as a matter of law.[2]

---

others did exclusively "field work." It appears that the general term bailiff as used here encompasses a number of different positions with differing responsibilities. For Judge Grimes to speak in general terms about changing the responsibilities of the bailiff is of little force where it is impossible to generalize about the nature of all the plaintiffs' jobs.

2. In finding that the bailiffs were confidential employees the district court focused in part on the sections of the Indiana Code that make bailiffs "at will" employees and the Cannons of Professional Ethics. Additionally, the court relied on its earlier opinion in *Pruitt v. Kimbrough,* 536 F.Supp. 764 (N.D.Ind.1982), *aff'd without opinion,* 705 F.2d 462 (7th Cir.1983), where in dicta it was stated that "it is clear that

. . . bailiffs are confidential employees." 536 F.Supp. at 767. To the extent the district court opinion stands for the proposition that bailiffs are confidential employees as a matter of law it is inapposite with *Elrod* and *Branti.*

First, while we focus on the inherent powers of the office rather than the individual who occupies it, *Tomczak,* 765 F.2d at 641, it is impossible to generalize about the nature of an individual type of position, such as bailiff or secretary; job responsibilities and duties can vary greatly between different governmental units or even within a governmental unit. For example, the plaintiffs are classified under the general heading of bailiffs but their responsibilities differed substantially. *See supra* note 1. For this reason the test under *Branti* must be

Service of process and courtroom security do not inherently translate into access to the decisionmaking process or confidential information. Defendants stress that any access to court records when coupled with political animosity creates a serious threat of politically motivated breaches of the confidentiality of the judicial process. This argument, while relevant, proves too much. These bailiffs are duty-bound to protect the sanctity of the court, and, while political affiliation may be an acceptable proxy for loyalty, trust, and maybe even efficiency, it would cast the net of the *Elrod* exception too wide to allow political support to be used to extrapolate a tendency to breach a sworn duty, behave unprofessionally, or commit criminal acts. Under the circumstances of this case there is no basis for finding, as the trial court did, that the plaintiffs were so intimately related to the confidential functions of the Gary City

Court that politics were a legitimate qualification for employment. *Cf. Soderbeck*, 752 F.2d 288 (confidential secretary).[3]

This does not end our analysis because, as was alluded to in our opinion in *Soderbeck* and stated explicitly by the Fifth Circuit in *Stegmaier v. Trammell*, 597 F.2d 1027 (5th Cir.1979), there are circumstances in which the animosity engendered by a political struggle makes it impossible for two people to work together in an intimate environment. In *Stegmaier*, a pre-*Branti* opinion, the court held that an employee can fall "within the confidential employee exception even though the position of Deputy Circuit Clerk does not stand in a confidential relationship to a policymaker or a policymaking process." 597 F.2d at 1040.[4] In *Soderbeck*, Judge Posner, writing for the court, stated in dicta that political animosity can provide a basis for dismissal of an employee who stands in a confidential

applied to each individual office, and status under that formulation is left to the trier of fact to be determined. *See Soderbeck*, 752 F.2d at 288; *Nekolny*, 653 F.2d at 1169–70. *See also Elrod*, 427 U.S. at 367–68, 96 S.Ct. at 2686–87. A further illustration of the fact that bailiffs are not *per se* confidential employees is that among the plaintiffs granted protection in *Elrod* were process servers and bailiffs.

Second, the provisions of the Indiana Code making the plaintiffs at will employees are irrelevant. A similar argument was made before the Supreme Court in *Elrod* and rejected.

That is the notion that because there is no right to a government benefit, such as public employment, the benefit may be denied for any reason. *Perry*, however, emphasized that "[f]or at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely." 408 U.S. [593] at 597, 92 S.Ct. [2694] at 2697 [33 L.Ed.2d 570 (1972)]. *Perry* and *Keyishian* properly recognize one such impermissible reason: The denial of a public benefit may not be used by the government for the purpose of creating an incentive enabling it to achieve what it may not command directly. "'[T]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected.'" *Keyishian v. Board of Regents*, 385 U.S. [589], at 605–606, 87 S.Ct. [675], at 685 [17 L.Ed.2d 629 (1967)]. "It is too late in the day to doubt

that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Sherbert v. Verner*, 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963).

*Elrod*, 427 U.S. at 360–61, 96 S.Ct. at 2683–84 (discussing *Perry v. Sindermann*, 408 U.S. 593 (1972) and *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967)).

3. It should be noted that the vast majority of cases have dealt with "policymaking" employees. *See, e.g., Tomczak v. City of Chicago*, 765 F.2d 633 (7th Cir.1985) (second highest position in city water department); *Shakman v. Democratic Organization of Cook County*, 722 F.2d 1307 (7th Cir.1983) (Superintendent of Employment for the Chicago Park District); *Livas v. Petka*, 711 F.2d 798 (7th Cir.1983) (assistant prosecutor); *Nekolny v. Painter*, 653 F.2d 1164 (7th Cir.1981) (senior citizen's coordinator), cert. denied, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982); *Ness v. Marshall*, 660 F.2d 517 (3d Cir.1981) (city solicitor).

4. The plaintiff in *Stegmaier* was a deputy circuit clerk of the court. The court found that the office of the clerk was not a policymaking office but that the circuit clerk was entitled to pick his own assistant because the position of deputy clerk was "confidential." This decision was based on the fact that, while the deputy clerk has no effect on policy or access to confidential material, the clerk had to run on a platform of honesty and integrity and, therefore, could hire a person who he felt was loyal and trustworthy.

relationship with a non-policymaking office. 752 F.2d at 288.[5] These cases illustrate the problems facing courts in dealing with politically discharged employees who do not fit comfortably within the *Branti* formulation yet are intimately involved with the political figure's work environment. It is possible to claim that such positions are confidential, since they require trust and loyalty and are thus offices for which political affiliation is an appropriate requirement for effective job performance. However, these types of employees are in important respects different than those covered by *Elrod* and *Branti*. And, while they may not be entitled to protection under the First Amendment, this conclusion does not flow naturally from *Branti*.

Underlying *Elrod* and *Branti* is a generally accurate assumption about the bureaucratic nature of government. These two cases and their progeny reveal a conception of government employment in which various decisionmakers preside over a large infrastructure composed of more or less ministerial employees who carry out policy mandates. An elected official must have the loyalty of his policymaking assistants in order to operate the government efficiently, as well as to attempt to carry out the policies upon which he or she was elected. The remaining employees within a bureaucratic structure rarely if ever come into contact with the policymakers. Their ties to the bureaucracy are based not on loyalty to the political figure but on more formal structural relationships. The ability to create large organizations is based on the use of organizational, as opposed to personal, loyalty and this is achieved through hierarchial, as opposed to interpersonal, authority. *See* K. Boulding, *The Organizational Revolution: A Study on the Ethics of Economic Organization* 8–40 (1953). *See also* W. Whyte, Jr., *The Organization Man* (1956). From this model the *Elrod-Branti* distinction between those employees for whom politics can be a job criterion and those for whom it cannot is relatively clear: political loyalty is particularly relevant only with respect to those offices "where the employee creates or implements policy and has broad responsibilities with ill-defined objectives," *Tomczak*, 765 F.2d at 642, and where the employee is in a confidential relationship with a policymaking official.

The troublesome cases, like *Soderbeck*, *see supra* note 5, and *Stegmaier, see supra* note 4, are those to which the bureaucratic model and thus *Elrod* and *Branti* do not comfortably apply. This situation arises in the context of the intimate working environment; it is here that a non-confidential non-policymaking employee can work in such a close relationship with the elected official that animosity arising from political

**5.** In *Soderbeck* this court faced a situation where a newly elected sheriff fired the previous sheriff's secretary who happened to also be the wife of the unsuccessful incumbent. The sheriff's office in Burnett County, Wisconsin was a very small operation and the court observed that, while Mrs. Soderbeck could be viewed as a confidential secretary, it was in part the nature of the office that would allow a jury to conclude that the plaintiff was unprotected.

Mrs. Soderbeck, however, had been trained as a bookkeeper and her title was bookkeeper, not secretary or confidential secretary; and though she did do most of the typing in the sheriff's office, there was evidence that if the sheriff needed something typed he would hand his handwritten draft to whoever in the office was handy. Burnett County has a population of only 12,000 and a tiny sheriff's office whose six employees at the time of Mrs. Soderbeck's termination did not have sharply differentiated tasks; it was only after she was fired that a position of "confidential secretary" was created with a different job description from that of the bookkeeper's position that Mrs. Soderbeck has occupied. So while she did typing and handled legal papers, such as summonses and warrants, the other employees did these things too. She also did janitorial work, and performed domestic chores for the prisoners in the county jail (which is in the same building as the sheriff's office and home) as jail matron and laundress—not the usual functions of a confidential secretary. And she did not take dictation—no one in the office did. If she could be fired as a confidential employee, so could anyone else employed in the office, on the theory that if an office is small enough the tasks usually performed by the boss's personal secretary may be parcelled out among all the employees.

*Soderbeck*, 752 F.2d at 288.

opposition can create an untenable job situation. The paradigm example of this type of environment is the chambers of a judge. Thus, while the court system as a whole may be described as bureaucratic, *compare* Vining, *Justice, Bureaucracy, and Legal Method,* 80 Mich.L.Rev. 248 (1981), *with* Edwards, *A Judge's View on Justice, Bureaucracy, and Legal Method,* 80 Mich.L. Rev. 259 (1981), the individual chambers constitute cells within an organization where relationships must be based on loyalty and rapport because of the constant face to face contact resulting from the more intimate surroundings.[6] Political animosity, while not a noble basis for discharging an employee, can in practice create a hostile work environment where face to face contact and cooperation are essential. It would strain credulity to read the First Amendment or *Elrod* to require an elected official to work in constant direct contact with a person viewed as a political enemy. This would seem to be contrary to the respect this court has given the governmental interest in efficient public administration under the *Branti* formulation, *Soderbeck,* 752 F.2d at 288, and therefore we refuse to extend the protections of *Elrod* to these intimate settings.

■ We must stress the limited nature of the scope of this opinion. First, it applies to a select number of government employees: only those employees who work in direct and constant contact with a political official-employer would be exempted from the First Amendment's protection against patronage dismissals. For example, with respect to an individual judge's chambers it may refer only to the judge's secretary, the law clerks, and, possibly, a court reporter or bailiff assigned exclusively to the judge. Employees who work outside the everyday immediate work environment would be protected unless they were otherwise exempted under the *Elrod-Branti* formulation. Second, this opinion merely provides a basis for a problem this court has faced before and resolved in favor of allowing discharge. *See Soderbeck,* 752 F.2d 285. *See also Shondell,* 775 F.2d at 864; *Stegmaier,* 597 F.2d at 1040. All that is involved here is a recognition of a legally cognizable distinction between "bureaucratic" employees and those government workers employed in less structured settings.

### B.

■ Turning to the particular facts of this case, we are unable to affirm the district court. As was discussed above, *see supra* pages 420–21, the district court's holding that the plaintiffs were confidential employees because of the potential for leaks of confidential information and for behavior impugning the character of the court cannot be sustained. We will not engage in the process of inferring a breach of duty from political opposition where the record does not even clearly support a finding that these bailiffs had routine access to sensitive documents. At least five of the plaintiffs worked almost exclusively outside the court where their primary responsibility was service of process. Process servers are not exempted employees who can be fired for political reasons. *Elrod,* 427 U.S. 348, 96 S.Ct. at 2677.[7]

As well as not being traditional "policymaking" or "confidential" employees, it ap-

---

**6.** "Certainly elected officials should be permitted to dismiss their predecessor's personal secretaries and a few others who work closely with such officials in positions requiring a relationship of mutual trust." *The Supreme Court, 1975 Term,* 90 Harv.L.Rev. 186, 194 n. 41 (1976) (discussion of *Elrod*).

**7.** Defendants attempt to distinguish the type of process servers and bailiffs involved in *Elrod* on the grounds that the judge is the hiring authority rather than the sheriff. This argument cannot be accepted; an elected judge is not entitled to any special patronage power beyond that given to other political figures under the First Amendment. What may distinguish judges for patronage purposes is the unique relationship they have with the people who work with them in their chambers. However, differing structures of judicial systems and governments mean that each case is unique and an intimate working environment may or may not exist surrounding any political hiring authority.

pears that none of the plaintiffs were an integral part of the daily routine in Judge Grimes's chambers. During oral argument each party was pressed to explain the duties of the bailiffs but provided no definitive answer. From the argument and the record one is left with the impression that even the courtroom bailiffs were not affiliated with Judge Grimes's chambers and that all the plaintiffs were ministerial employees of the larger organization that is the Gary City Court. Nevertheless, we cannot rely on impressions or educated guesses and this case must be remanded to the district court so a record about the nature of the bailiffs' duties can be created.

On remand the district court should focus on the inherent powers of the office of the bailiff for the Gary City Court rather than what these plaintiffs actually did or what the defendant plans for them to do. *See supra* note 1. At the same time it should be noted that there seem to be differentiations in the nature of positions classified generally as bailiffs. The court should consider each type of bailiff separately unless it finds that the assignment to a specific duty was non-permanent and that transfers between field work and the courtroom freely occurred. Finally, it is important to emphasize the narrow issue upon which this case is being remanded; we are ordering a trial solely limited to the issue of the closeness of the relationship between the judge and the bailiffs. There is no reason to disturb the district court's findings with regard to the defendants' motives. Thus if the district court on remand finds after examining the closeness, intimacy, or confidentiality of the relationship with the judge involved in the position held by each plaintiff, that the political animosity present in this case did not invariably lead to a untenable work situation, then a judgment for the plaintiffs should be entered.

### III.

Based on the foregoing this judgment is reversed and remanded for further proceedings consistent with this opinion.

