**Aurea E. VAZQUEZ RIOS, et al.,
Plaintiffs, Appellees,**

v.

**Rafael HERNANDEZ COLON, etc., et
al., Defendants, Appellants.**

No. 86–1610.

United States Court of Appeals,
First Circuit.

Heard Dec. 1, 1986.

Decided April 8, 1987.

Submitted on Motion for Rehearing
April 29, 1987.

Opinion on Denial of Rehearing
May 20, 1987.

Pedro Juan Perez Nieves with whom Saldana, Rey, Moran & Alvarado, Santurce, P.R., Hector Rivera-Cruz, Secretary of Justice, and Rafael Ortiz-Carrion, Sol. Gen., San Juan, P.R., were on brief, for defendants, appellants.

Pedro Miranda Corrada, San Juan, P.R., with whom Hector Urgell Cuebas, Santurce, P.R., was on brief, for plaintiffs, appellees.

Before CAMPBELL, Chief Judge, COFFIN and SELYA, Circuit Judges.

SELYA, Circuit Judge.

There has been a steady drumbeat of civil actions involving claimed politically motivated discharges arising out of the change in administration following Puerto Rico's 1984 gubernatorial election. The case at bar deals with several more positions in that litany. There are seven appellees. All of them aver that they were dismissed from their government positions because of their political affiliation with the Partido Nuevo Progresista (PNP).[1] The PNP, after eight years in power, was defeated at the polls by its arch-rival, the Partido Popular Democratico (PDP).

Personnel realignments followed fast and furious on the winds of electoral fortune. These moves included the ousters of the present appellees. After they were dismissed, the seven sued the defendants (appellants before us), Rafael Hernandez-Colon, the newly-inaugurated Governor of the Commonwealth (elected on the PDP ticket), and Alvaro Padial, formerly the special aide in charge of administration of the Office of the Governor. The defendants are alleged to have ordered the discharges in violation of the principles announced by the Court in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). The plaintiffs sought reinstatement,[2] backpay, compensatory and punitive damages, and ancillary relief pursuant to 42 U.S.C. § 1983.

The appellants moved for partial summary judgment on the issue of qualified immunity in respect to all seven plaintiffs, but the district court denied their motions. This interlocutory appeal followed. At this juncture, we have jurisdiction to consider only the narrow question of whether the denials of partial summary judgment based on defendants' claims of qualified immunity were proper. *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 2815–17, 86 L.Ed.2d 411 (1985); *De Abadia v. Izquierdo Mora,* 792 F.2d 1187, 1190 (1st Cir. 1986).[3]

Rather than retrace the methodology to be employed in cases of this genre, we adopt the analysis set forth in sections II and III of our opinion in *Mendez-Palou v. Rohena-Betancourt,* 813 F.2d 1255, 1257–1259 (1st Cir. 1987). This permits us to focus solely upon the nature of the affect-

---

1. All seven of the plaintiffs also allege in their complaints that the defendants violated their rights to procedural due process. We do not consider this aspect of the case, however, because the issue was not discussed on appeal.

2. Padial's successor as special aide is also a party to this action for the purposes of injunctive relief. Fed.R.Civ.P. 25(d).

3. In addition to seeking immunity from the § 1983 damage claims, appellants also urge us

to exercise what they self-servingly describe as our pendent appellate jurisdiction to dismiss that portion of the complaint which seeks injunctive relief and reinstatement. Due to the circumscribed nature of our interlocutory review, however, we cannot take such a step in the context of this appeal. *See Cheveras Pacheco v. Rivera Gonzalez,* 809 F.2d 125, 127 (1st Cir.1987); *Bonitz v. Fair,* 804 F.2d 164, 166–67, 175–76 (1st Cir.1986).

ed positions and the question of whether these plaintiffs, or any or all of them, were protected against patronage dismissals by a clearly established constitutional right.

Although not dispositive of the federal constitutional issues, we note that the seven jobs have been classified as positions of trust and confidence under § 5.10 of the Puerto Rico Public Service Personnel Act. P.R.Laws Ann. tit. 3, § 1350. All of the employees were based at La Fortaleza, the governor's executive mansion. Five of them fall somewhat naturally into a single discrete grouping. These five—Aurea Vazquez-Rios, Margarita Calderon-Andino, Bienvenido Perez-Perez, Enrique Colon-Rivera, and Angel Luis Gonzalez-Robles—all performed labors of an essentially domestic nature. Vazquez-Rios and Calderon-Andino were cleaning women, Perez-Perez and Colon-Rivera were waiters, and Gonzalez-Robles was a supervisor of domestic services. The configuration of their positions is such that their situations can be discussed in the ensemble. The remaining appellees are Matilda Maldonado-Feliciano, an editing assistant in the governor's press office, and Olga Salvatella-Schmidt, an Executive Secretary III in the Office of Cultural Affairs. Each of their cases must be considered separately.

## I. *The Domestic Employees*

Vazquez-Rios, Calderon-Andino, Perez-Perez, Colon-Rivera, and Gonzalez-Robles allege that they were dismissed from their respective housework positions on account of their political affiliation. The complaint which they filed in the district court, however, stated only that the posts from which they were removed were of a nonpolicymaking nature and that the proper performance of their duties did not require membership in the PDP. Because these conclusory allegations, without more, do not permit a reasoned finding as to whether these five plaintiffs, given their particular positions, enjoyed a clearly established constitutional right to be protected from politically motivated discharges, we look to other established facts contained in the nisi prius roll. *See Mendez-Palou, supra,* at

1259–1260; *cf. Bonitz,* 804 F.2d at 168 n. 4.

In this regard, the record on appeal includes so-called "Class Concept" materials, that is, classification criteria prepared by the Puerto Rico Central Office of Personnel Administration (COPA), describing the general nature of particular grouped positions. The ossature of the workplace is fleshed out by job description forms, also originating with COPA, which illuminate in finer detail the actual duties corresponding to each post. With respect to "Cleaning Persons" (the titular rubric under which Vazquez-Rios and Calderon-Andino fell), the Class Concept described the positions thusly:

> Simple housework which includes performing cleaning and maintenance tasks within the Executive Mansion.

> The employee receives general instructions from the Supervisor of Executive Mansion Affairs and his/her work is reviewed based on the results obtained.

The job description questionnaires for these positions demonstrated that the scope of the work subsumed the following constituent chores:

1. Clean doors.
2. Clean mirrors in rooms and bathrooms.
3. Dispose of garbage and clean trashcans.
4. Clean and polish tiles in stairs and bathrooms.
5. Clean and polish marble.
6. Clean windows.
7. Change light bulbs.
8. Vacuum rugs.
9. Clean stairs.
10. Clean and polish adornments and decorative objects.
11. Change candles.
12. Clean, organize and give maintenance to broom closet.
13. Inform of imperfections in equipment.
14. Maintain the assigned work area clean at all times.

15. Maintain bathrooms stocked at all times.

16. Clean file cabinets and shelves.

Regarding the position of "Waiter," the slot occupied by Perez-Perez and by Colon-Rivera, the Class Concept provided in relevant part:

The employees in this class serve food in the Executive Mansion and other official places to the Governor, the First Lady and children, in addition to the guests and visitors.

The employees receive specific instructions from the Supervisor of Domestic Services and their work is evaluated based on the results obtained.

According to the questionnaire which enumerated the particular tasks of the position, a waiter must:

1. Serve the Governor, the First Lady and children.

2. Serve meals to guests and visitors.

3. Chill wines, serve cordials and snacks.

4. Serve in the Governor's waiting room, in the Office of the Governor and that of the First Lady.

5. Serve and clean up in the activities that are carried out in the small theater, internal patio and [outer] walls [area].

6. Know how to distinguish the utensils to be used at each type of meal, depending on the occasion, if it is formal or informal.

7. Inform whenever any material is needed.

The last of the five clustered positions is that of "Supervisor of Domestic Services". The Class Concept described the job's responsibilities as follows:

Work of some complexity and responsibility, supervising the work of the waiters or cooks of the Executive Mansion. The employee in this class sees that the instructions given are carried out in order to obtain the best service from waiters and cooks within the Executive Mansion.

He/She receives ·general instructions from the Director of the Executive Man-

sion, who evaluates his/her work on the basis of the results obtained.

In turn, the job description listed for the position reflected its components as:

1. Supervise the waiters.

2. Assign shifts to the waiters daily.

3. Serve the Governor personally when it is his shift.

4. Assist Mrs. Vallecillo [staff director at the Executive Mansion] in doing the shopping.

5. In Mrs. Vallecillo's absence, he is the one who supervises the kitchen.

6. Do any other work assigned to him.

■ From the foregoing descriptions, it seems abundantly clear that these five employees performed ministerial functions of a purely domestic nature. None of them were involved in policymaking, the communication of political ideas, or sensitive tasks connected with the policymaking function, *i.e.*, the partisan goals of the governor's office. The duties of each were of the sort which "are measured solely by strictly technical or professional criteria." *Mendez-Palou, supra*, at 1258. Gonzalez-Robles, to be sure, had some supervisory authority, but only over the conduct of housekeeping matters—and mundane operational ones at that. Ideology cannot plausibly be said to have the remotest bearing on how food should be served or how doorknobs should be polished. It has equally little bearing on a majordomo's oversight of such tasks.

We have remarked before that "the law seems clear at either end of the *Elrod-Branti* spectrum." *Mendez-Palou, supra,* at 1258 (quoting *De Abadia*, 792 F.2d at 1194, Campbell, C.J., concurring). These hirelings clearly toil at or near the (nonpolitical) terminus of that spectrum. They are modern-day equivalents of the "hewers of wood and drawers of water" of whom an Old Testament patriarch is said to have spoken. *See* Joshua 9:21. The employments in question did not potentially concern matters of partisan political interest, nor did they involve even a modicum of policymaking responsibility or service as an authorized spokesperson. The work of this quintet in no way relates to "partisan polit-

ical interests.... [or] concerns." *Branti*, 445 U.S. at 519, 100 S.Ct. at 1295. Thus, the jobs seem to be "nonpartisan in nature" within the purview of the test which we have articulated, *see Mendez-Palou, supra*, at 1258, and not properly the targets of political patronage.

Nevertheless, notwithstanding the lack of any tangible connection between these positions and the policymaking process, the appellants argue with some persuasive force that there exists a further *Elrod-Branti* exception for "confidential" employment, and that these jobs fit comfortably within the integument of that exception. We agree with the appellants' premise—but we cannot accept their conclusion.

We trace the lineage of this further exception before attempting to define its stature. The concept of according special treatment to the hiring and firing of "confidential" aides predates *Elrod-Branti;* its roots appear to stem from a Seventh Circuit decision authored by Justice (then Judge) Stevens, *Illinois State Employees Union, Council 34 v. Lewis*, 473 F.2d 561 (7th Cir.1972), *cert. denied*, 410 U.S. 928, 943, 93 S.Ct. 1364, 1370, 35 L.Ed.2d 590 (1973). Justice Stevens, after acknowledging a public official's prerogative to use political philosophy or affiliation as a guide in the selection of policymakers, wrote:

> [C]onsiderations of personal loyalty, or other factors besides determination of policy, may justify the employment of political associates in certain positions.

*Id.* at 574.

The plurality opinion in *Elrod*, 427 U.S. at 349–74, 96 S.Ct. at 2678–90 (Brennan, J.), though citing liberally to other portions of Justice Stevens's opinion in *Lewis*, made no mention of such a further exception. Justice Stewart, however, nourished the idea in his concurring opinion, in which Justice Blackmun joined:

> The single substantive question involved in this case is whether a nonpolicy-making, nonconfidential government employee can be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground

of his political beliefs. I agree with the plurality that he cannot.

*Elrod*, 427 U.S. at 375, 96 S.Ct. at 2690 (Stewart, J., concurring) (citation omitted).

Some four years later, the notion that "confidential" employees should be exempted from *Elrod* protection had become ingrained. *See, e.g., Branti*, 445 U.S. at 518, 100 S.Ct. at 1294 ("Under some circumstances, a position may be appropriately considered political even though it is neither confidential nor policymaking in character."). The Court cautioned, however, that

> the ultimate inquiry is not whether the label "policymaker" or "confidential" fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.

*Id.* That caveat, however, has certain limitations. Labels may be inexact—but they can nevertheless be useful tools for analytic purposes. As courts have parsed the meaning of *Elrod-Branti*, it has become apparent that the considerations which make party affiliation an appropriate requirement for a given office are somewhat different in the case of "confidential" employees (as we utilize the term) than in the case of "policymakers."

Post-*Branti*, there has been a dearth of reasoned analysis as to the nature and extent of the "confidential employee" exception. Perhaps the most helpful explication is to be found in *Meeks v. Grimes*, 779 F.2d 417 (7th Cir.1985). *Meeks* involved bailiffs who were dismissed from their municipal court positions because of political estrangement from the newly-elected judge. The Seventh Circuit held:

> It would strain credulity to read the First Amendment or *Elrod* to require an elected official to work in constant direct contact with a person viewed as a political enemy. This would seem to be contrary to the respect this court has given the governmental interest in efficient public administration under the *Branti* formulation, ... and therefore we refuse to

extend the protections of *Elrod* to these intimate settings.

We must stress the limited nature of the scope of this opinion.... [O]nly those employees who work in direct and constant contact with a political official-employer would be exempted from the First Amendment's protection against patronage dismissals.

*Id.* at 423 (citation omitted).

We agree in principle, if not in precise particulars, with the Seventh Circuit. We recognize that there may be—and doubtless are—public employees who occupy positions of such unusually intimate propinquity relative to government leaders that, despite their noninvolvement with partisanship and policymaking, political loyalty could be deemed an appropriate requirement of the job for purposes of muzzling the *Elrod-Branti* watchdog. In the proper case, such a delicate juxtaposition can embody an "overriding interest ... of vital importance," *Branti*, 445 U.S. at 515–16, 100 S.Ct. at 1293 (citation omitted), sufficient to sustain a requirement that a person's political beliefs conform to the wishes of the hiring authority. But, this litigation is at a remove from the bosom of the lodge. This case deals with persons in service at La Fortaleza generally, not with, say, a valet or chauffeur specifically assigned to minister to the governor alone.

We concur, as one commentator has noted, that while "elected officials should be permitted to dismiss their predecessors' personal secretaries and a few others who work closely with such officials in positions requiring a relationship of mutual trust[,] ... courts should construe the [confidentiality] exception narrowly and guard against efforts to invoke it in support of across-the-board patronage dismissals." *The Supreme Court, 1975 Term*, 90 Harv. L.Rev. 186, 194 n. 41 (1976). *Compare Soderbeck v. Burnett County, Wis.*, 752 F.2d 285, 288 (7th Cir.1985) (policymakers should not be "forced to keep political enemies as their confidential secretaries") *with Lewis*, 473 F.2d at 574 (considerations which undergird confidentiality exception not "valid for positions such as janitors,

elevator operators or school teachers"). In our case, the affected maids and waiters were, in the *Meeks* phrase, 779 F.2d at 424, "ministerial employees of the larger organization," that is, La Fortaleza. They were not exclusively enfeoffed to the governor, nor were their duties of necessity an "integral part of [his] daily routine...." *Id.* Only the two waiters and their supervisor performed *any* tasks directly with or for the governor; and their job descriptions, *see ante*, make manifest that these aspects of their work in no way predominated. In point of fact, the opposite appears to be true: the overwhelming majority of the duties of this quintet appear to be devoted to the service of the larger institution. Thus, these five positions fail to kindle the kind of unusually intimate propinquity such as would burn the occupiers' bridges behind them, and disentitle them to protection from patronage dismissals under the *Elrod-Branti* standard.

■ That is not, however, the end of the tale. Confidentiality has many facets, and the appellants maintain that those in the domestic workforce at La Fortaleza, even if not sufficiently wedded to the governor, should be considered "confidential" employees within the sweep of the *Elrod-Branti* exception on account of their ready access to sensitive political information. Those who occupy menial positions at the seat of power, this thesis runs, pose a threat to the integrity of the political discussions and decisionmaking which occur within the penetralia of the executive mansion. Cleaning personnel undeniably have access to the governor's private belongings, working papers, matters in process—and the detritus of the day as well. Their duties may cause them to pass through, or enable them to enter, areas where sensitive discussions (personal or political) are being carried on. They may happen across tidbits not meant for their consumption. In turn, persons that serve food and beverages at La Fortaleza present somewhat comparable security risks. Accordingly, the appellants tell us, keeping these people in place would unduly inhibit the governor's working environment and lifestyle.

The fundamental problem with this asseveration is that it proves too much. If official uneasiness at the suspicion that a government worker might stoop to snoop were enough to doff the *Elrod-Branti* cloak, then few jobs would be safe from the paranoia (real or feigned) of the policymakers. In delimiting the range and reach of the "confidential" public employee exception, we think it essential to distinguish carefully between those employees whose jobs *intrinsically* place them in a confidential position relative either to policymakers or the policymaking process, and those whose jobs merely permit an *incidental* exposure to sensitive material that is in fact beyond the bounds of their employment. Both the chief of staff and the janitor enjoy what could be called "access" to a governor's office and to the (presumably) secret political information contained in that inner sanctum. But, there is an appreciable difference in kind. For the chief of staff, access represents an inherent attribute of his post. For the janitor, access is but a happenstance, an incident of an otherwise unrelated position.[4] Political advisers and personal secretaries are entrusted to work with the covert material to which they are privy. Domestics, by contrast, have no legitimate part to play on the political stage; indeed, any use they might make of classified information which falls into their hands would be a serious breach of duty. Politics aside, any worker could certainly be replaced for such dereliction. *E.g., Elrod,* 427 U.S. at 366, 96 S.Ct. at 2686 ("employees may always be discharged for good cause, such as insubordination or poor job performance, when those bases in fact exist").

The bottom line is that policymakers, and those who work in ongoing and intimate proximity to them, cannot reasonably expect *Elrod-Branti* insulation in their fundamentally political jobs. Custodial employees of the type involved here—persons who have no authorized access to eyes-only information and who do not toil directly and exclusively for the policymaker—can most certainly expect such protection. The mere fact that a waiter might overhear a clandestine conversation or a maid might surreptitiously acquire knowledge of some intensely personal matter cannot alone suffice to transmogrify a protected position into a nonprotected one. After all, virtually *every* employee is, in some sense at least, a potential eavesdropper ... and therefore, a potential spy. If this were enough to make political allegiance an appropriate employment criterion, no public servant—from elevator operator to political operative—would be safe from the vagaries of electoral fortune. *Elrod-Branti* would lose all meaning.

We are aware that one district court has indicated that, despite the abecedarian nature of their assigned duties, political ties are appropriate criteria for positions of this sort because no "governor is going to feel comfortable having this type of employee around him unless there exists trust and confidence in the person." *Santiago Correa v. Hernandez-Colon,* 637 F.Supp. 1159, 1161 (D.P.R.1986) (dicta). That kind of analysis, however, puts the cart before the horse. Political affiliation may serve as a proxy for trustworthiness in certain circumstances, but the reverse cannot be true. Lack of political affiliation (or possession of the "wrong" political affiliation) cannot automatically be read to imply untrustworthiness. As *Elrod* teaches, "mere political association is an inadequate basis for imputing disposition to ill-willed conduct." 427 U.S. at 365, 96 S.Ct. at 2685. The Seventh Circuit made this point in *Meeks,* when it rejected the argument that a bailiff of a political persuasion unlike that of the judge to whom he was assigned should be considered a "confidential" employee within an *Elrod-Branti* exception:

> [W]hile political affiliation may be an acceptable proxy for loyalty, trust, and maybe even efficiency, it would cast the

---

4. An example may assist in making the point. The janitor whose principal function is to clean, dust, and empty the wastebaskets in a conference room or an executive suite, can expect, as an incident of his vocation, to find papers littering the tabletop. It should make no legitimate difference in terms of his duties, however, whether those papers comprise the governor's laundry list or the strategic master plan for His Excellency's next campaign.

net of the *Elrod* exception too wide to allow political support to be used to extrapolate a tendency to breach a sworn duty, behave unprofessionally, or commit criminal acts.

*Meeks,* 779 F.2d at 421.[5]

· Despite the fact that the dimensions of the confidentiality exit from the *Elrod-Branti* citadel have not been precisely plotted in the caselaw, that is largely a matter of articulation. The basic principles which infuse our rendering of the concept were part and parcel of *Elrod* and *Branti,* and were manifestly evident in the doctrinal underpinnings of the general rule concerning when—and under what circumstances—pure patronage dismissals might or might not be justifiable. Whatever novelty may attach to our analysis of the confidentiality exception does not suggest in any way that the right of these "hewers of wood and drawers of water" to be free from the spoils system, and therefore from patronage dismissals, was anything less than clearly established from *Branti* forward.[6]

■ In fine, on the record before us, the appellants could not reasonably have believed that any of these five employees were legitimately subject to dismissal on the basis of political affiliation. If the *Elrod-Branti* principle is to have any vitality at all—if exceptions are not to be allowed to swallow the rule—then these five employees, given what we know of their particular positions, must be held to have enjoyed the protection of a clearly established constitutional right against politically motivated discharges. Accordingly, the defendants to this point have failed to show that they enjoyed qualified immunity against civil damage actions arising out of these firings, and the decision of the district court denying the motions for partial summary judgment in respect to this group of workers must be affirmed.

## II. *The Editing Assistant*

■ As with the quintet of domestic employees, the complaint contained only conclusory allegations concerning Maldonado-Feliciano's position as a "text writer's aide" or "editing assistant." So, we look to other undisputed facts of record. *See supra.* And, when we do so, we find that her employment in the governor's press office is of a texture considerably different than that discussed in Part I.

The Class Concept issued by COPA describes the editing assistant's position in pertinent part in the following way:

Work of some responsibility and confidentiality in the Continental Communications Division. The employee helps the Assistant Text Writer in the preparation of speeches, messages and letters to be issued by the Office of the Governor. The employee in this class, under the supervision of the Assistant Text Writer, prepares messages, speeches, letters and other documents. He/She assists in the production of television and radio programs where the Governor, his Assistants or any officer designated to represent the Governor in a determined activity may participate. The employee may help in the handling of the audiovisual equipment of the division and attending special visitors in the socio-cultural activities.

According to the job description for the post, a text writer's aide must:

1. Record radio and television newscasts and prepare daily a report or 'moni-

---

5. Reversing a district court finding to the contrary, *Meeks* held that the plaintiffs could not be treated as "confidential" employees merely because of the potential risk that sensitive information might "leak." The court said:

We will not engage in the process of inferring a breach of duty from political opposition where the record does not even clearly support a finding that these bailiffs had routine access to sensitive documents.

*Meeks,* 779 F.2d at 423.

6. The appellants cannot be said to have relied on the dicta in *Santiago Correa, supra,* as a basis for believing that they could fire the five domestics. The opinion in *Santiago Correa* postdated the events at issue in this case. It is, therefore, "irrelevant in determining whether defendant was objectively reasonable in thinking, *at the time of the discharge,* he could lawfully discharge [the worker]." *Rodriguez v. Munoz,* 808 F.2d 138, 142 (1st Cir.1986) (emphasis in original).

toring' of the most important news to send to the Governor with copy to the assistants. (T.V. newscasts are recorded at night and radio newscasts in the morning).

2. Continually revise and keep up-to-date the "Telex" machines of Associated Press and United Press. Cut out the most important news and keep a file of these.

3. Send through "Telex" to the press media informative press releases on activities in which the Governor has participated or statements of the First Executive.

4. In addition to the aforementioned, ... prepare letters answering those citizens who write to the Governor, as well as messages and press releases.

The most casual surveillance of these materials leaves little room for doubt that an editing assistant performs a significant amount of politically sensitive public relations work on behalf of the governor. The substantive preparation of media communications for a political leader is precisely the sort of effort which fits neatly within the communicator exception to the general prohibition against political firings. As the Court has observed, an elected leader "may appropriately believe that the official duties of various assistants who help him write speeches, explain his views to the press, or communicate with the legislature cannot be performed effectively unless those persons share his political beliefs and party commitments." *Branti*, 445 U.S. at 518, 100 S.Ct. at 1295.

Although not directly relevant to the narrow issue of qualified immunity in Maldonado-Feliciano's case, we find the recent decision in *Brown v. Trench*, 787 F.2d 167 (3d Cir.1986) to be of some interest. There, dealing with a mid-echelon public information position fairly comparable to the editing assistant's position at issue before us, the Third Circuit found political affiliation to be an appropriate criterion for employment. Notwithstanding that Brown's "writings are based on information from other departments and are never released until they are reviewed by both her super-

visor and by the Commissioners," *id.* at 170, the panel held that "[w]hile some of her duties were only technical or clerical in nature," *id.*, the essentially communicative aspects of her position predominated. As one whose "principal duty was to act as spokesman for the Commissioners and help promote county projects," *id.*, it was reasonable to conclude that the job could not be done effectively except by one who shared the Commissioners' political beliefs. *Id.* Much the same can be said of the editing assistant in the governor's press office in Puerto Rico.

Against the backdrop of this authority, we have no difficulty in finding that the appellants were objectively reasonable in believing that one in the position of text writer's aide could be dismissed based on party affiliation. Certainly, the law was not in any sense "clearly established" to the contrary. Accordingly, the defendants were shielded from Maldonado-Feliciano's damage action by the armor of qualified immunity, and the district court erred in denying their motion for partial summary judgment on this aspect of the case.

### III. *The Cultural Attache*

■ Prior to her discharge, Olga Salvatella-Schmidt had the title of "Executive Secretary III" in the governor's Office of Cultural Affairs. As with her comrades in arms in this case, her complaint is short on specifics. We look, therefore, to the job description (which all parties concede to be an accurate one). It limns the following duties connected with the occupation:

Work related with cultural and social activities in La Fortaleza (Office of the First Lady, of the Governor, Secretary's Week, Civil Servant's Week, Christmas Party at La Fortaleza, Homage to Exemplary Mothers of P.R., Governor's Christmas Concert, Three Kings Day Celebration at La Fortaleza, etc.)

Assist the Director in the activity on Three Kings Day and the Homage to Exemplary Mothers, Party for the Artists, etc., as well as other activities where ... requested. Represent the Director occasionally in meetings or activities, ...

Calendar meetings with the First Lady, etc.

Keep files up-to-date.

Provide movies weekly for the First Family.

Communicate with the artists selected to entertain in activities in the Executive Mansion.

Attend numerous telephone calls and channel them through other offices or Government Agencies whenever necessary.

Prepare weekly lists of persons interested in obtaining invitations to the Governor's [theater] Boxes. Make the pertinent selection and prepare the invitations.

Assist in the coordination of VIP visits with the Office of the First Lady and Tourist guides.

Correct the rough drafts of letters generated in the Office of Cultural Affairs. Maintain the list of the artistic class up-to-date.

Keep the Director's calendar.

Provide piano and sound whenever necessary.

Take dictation in Spanish and English and type transcription.

To be sure, this mixed bag of duties presents a much closer call vis-a-vis qualified immunity than was true of any of the other six appellees. *See supra* Parts I, II. Numerous functions involve some significant degree of policymaking, representation, or communication: *e.g.*, selecting those to be invited to use the governor's theater boxes, revising drafts of letters generated within the agency, answering telephone inquiries and channelling them, coordinating VIP visits, representing the Director of Cultural Affairs in meetings and activities, assisting the director in arranging celebrations, communicating with artists, and the like. The job possesses no personnel functions to speak of, but it does have a goodly number of ministerial aspects (*e.g.*, keeping the director's calendar, providing piano and sound when necessary,

filing, stenography). In sum, the position—over and above its admittedly clerical attributes—serves as a kind of cultural interface, a public liaison between the government and the artistic community. An Executive Secretary III acts as a spokesperson for the administration on matters aesthetic, representing the governor before, and maintaining ties with, this important segment of Puerto Rican society. That partisan political concerns may affect—and be affected by—the selection of honored guests, the management of visits of political leaders and other notables, the timing and nature of celebrations, the kinds of relations maintained with various segments of the artistic intellectual community, and like considerations, seems entirely realistic a possibility. In the last analysis, such concerns (which indubitably inform a proper execution of this role) overbalance for *Elrod-Branti* purposes the technical duties which the post also requires.

Although the question is not free from doubt, the very uncertainty which pervades it helps to dictate the answer: not only do the communicative aspects of the berth weigh heavily in the balance, but the closeness of the call suggests that it could not have been "clearly established," when Salvatella-Schmidt was cashiered, that political affiliation was an improper criterion for such a cultural attache. We conclude for these reasons that plaintiff Salvatella-Schmidt was not protected from the patronage dismissal which eventuated in her case by any well established constitutional right.[7] The district court should, therefore, have granted the defendants' motion for partial summary judgment on the basis of their qualified immunity.

### IV. *Conclusion*

To recapitulate briefly, we hold that the court below, for the reasons which we have stated, *see supra* Part I, properly denied the motions of the defendants/appellants for *brevis* disposition of the damage claims insofar as five of the plaintiffs/appellees

---

**7.** Accordingly, we need not consider whether her position could also be regarded as a confidential one vis-a-vis a putative policymaker (the

Director of Cultural Affairs). *See Soderbeck,* 752 F.2d at 288.

(Vazquez-Rios, Calderon-Andino, Perez-Perez, Colon-Rivera and Gonzalez-Robles) were concerned. On the record which was before the district court, it does not appear that these persons were policymakers, nor did they fall into any recognized exception as communicators or confidential employees. Their positions were not such as called for them to be in unusually intimate propinquity with the governor, nor did their jobs intrinsically place them in a confidential relation to the policymaking process. They appear to have been at enough of a remove in these respects to enjoy an *Elrod-Branti* haven. The defendants, of course, remain free to attempt to produce at trial additional evidence to demonstrate that this quintet, or some among them, do come within the sphere of confidentiality sufficiently to render political affiliation an appropriate criterion for their jobs.

We also find, on the bases articulated herein, *see supra* Parts II, III, that the district court erred in failing to grant the summary judgment motions as to the remaining two plaintiffs (Maldonado-Feliciano and Salvatella-Schmidt); the defendants, because they enjoy qualified immunity, cannot be held liable in damages to either of these claimants.

The cases, of course, remain open as to all of the appellees in respect to their claims for reinstatement and other equitable relief. *See supra* n. 3.

*Affirmed in part; reversed in part; remanded for further proceedings consistent herewith. Costs to appellees.*

### ON MOTION FOR REHEARING

The appellants have moved, *inter alia*, to have the panel rehear their appeal as to the claims of the so-called domestic employees. *See* maj. op. p. 321, Part I. We see no reason to do so. We continue to believe that "[t]he basic principles which infuse our rendering of the concept [of confidentiality] were part and parcel of *Elrod* and *Branti*, and were manifestly evident in the doctrinal underpinnings of the general rule concerning when—and under what circumstances—pure patronage dismissals might or might not be justifiable." Maj. at 326.

Moreover, *Branti*, 445 U.S. at 519, 100 S.Ct. at 1295, clearly established that its prophylaxis inures to the benefit even of a "confidential" employee, absent access to confidences which bear on partisan political concerns. As with the assistant public defender in *Branti*, there is only the remotest chance that any of the five domestic employees would stumble upon information which was *both* confidential *and* connected to partisan political concerns. In short, the motion for rehearing fails to persuade us that the appellants have a viable position on either of the two prongs of the argument.

*The petition for a rehearing is denied.* Chief Judge Campbell dissents from this order and would grant rehearing by the panel for the reasons set out in the attached dissent.

CAMPBELL, Chief Judge (dissenting from order denying rehearing).

I would not ordinarily dissent from an order denying rehearing but do so here because I believe the Secretary of Justice and Solicitor General of Puerto Rico, acting on behalf of the Governor of Puerto Rico, present compelling reasons for a rehearing on the question of the Governor's limited immunity.

In our panel opinion, we ruled, on a preliminary record, that certain domestic employees at La Fortaleza, the Governor's mansion, were not "confidential employees" such that they could be removed for partisan political reasons by the Governor. We recognized that employees who are genuinely "confidential" may be subject to political discharge if their employer can demonstrate that party affiliation is an appropriate requirement for the effective performance of their duties. But we construed the confidentiality exception narrowly. We felt the employees in issue had so far been shown to be merely "persons in service at La Fortaleza generally," and not "valet[s] or chauffeur[s] specially assigned to minister to the Governor alone." Maj. at 324. The former, we concluded, were not in sufficient close propinquity to the

Governor to be considered "confidential." We added, however,

> The defendants, of course, remain free to attempt to produce at trial additional evidence to demonstrate that this quintet, or some of them, do come within the sphere of confidentiality sufficiently to render political affiliation an appropriate criterion for their job.

Maj. at 329.

Especially in light of the last quoted language, I joined in the panel's opinion. I should have paid closer attention, however, to the fact that, besides clarifying the law concerning these employees' status, our opinion unfortunately denies limited immunity to the Governor—meaning that he remains answerable personally in damages. Had we allowed immunity, we could still have clarified the standards pertaining to these employees and let them pursue their claims for reinstatement. Now, having considered the Governor's persuasive petition for rehearing, I am convinced we erred in denying him limited immunity. The existence of limited immunity depends on whether the law was "clearly established" when the Governor discharged these employees that he could not do so. I believe the law then was anything but "clearly established."

In so saying, I agree with my colleagues' general approach that every domestic position at La Fortaleza is not "confidential" simply because the Governor resides there. To be "confidential," a waiter or cleaner must show such frequent and close propinquity to the person of the Governor (or immediate family members) that a confidential relationship will be inferred regardless of the fact that the employee's formal duties—unlike those of, say, a private secretary—do not call for any exchange of confidences with the Governor. If this kind of very intimate propinquity can be demonstrated, the Governor may still be able to prevail in the instant case.

But while, looking to the future, I can accept the panel's general guidelines, I do not see how we can possibly say that, at the time these employees were discharged, the law was clearly established against the

Governor's decision to discharge them. We point out in our opinion that the *Branti* decision (*Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980)) acknowledged that "confidential" employees may be unprotected against political discharge. The Court has yet to define a confidential employee. When the Governor fired these employees, there was scant case law even in the lower courts to clarify the protected or unprotected status of a governor's household servants who are not *de jure* confidential but who, because of their intimate propinquity to him and his family, may become the de facto recipients of intimate and confidential bits of knowledge of potential use to political enemies.

My colleagues agree that in more usual cases—those relating to the discharge of middle-level "policy-making government employees—the law has not, at least until recently, been "clearly established." I am at a loss to know why, in the present context, they think the law of confidential employees was any more clear. If anything, I believe the law pertaining to the latter was *less* clear.

Hence while I believe the panel has initiated standards, which, when refined by further experience, may become workable for determining whether or not particular domestic servants working in a governor's household may be fired, I strongly dissent from their view that the law prior to this was ever established. I would thus allow a rehearing on the question of the Governor's limited immunity. Given the murkiness of the law, I believe he should be held immune.