Miguel A. ROSARIO TORRES; Antonio Bello Mendez; Victor Pedraza Rosario; Jose M. Torres Pagan; Mildred Matos, and the conjugal partnership formed by both spouses; Angel M. Diaz Mila; Juan J. Claudio Morales; Felix Resto Nieves; Eledmiro Loubriel Cancel; and Maria Soto Rodriguez, Plaintiffs,

v.

Rafael HERNANDEZ COLON, Governor of the Commonwealth of Puerto Rico, in his personal and official capacities, and Lila Mayoral; and the conjugal partnership formed by both spouses and Franklin Martinez, in their personal and official capacities, and Jane Doe and the conjugal partnership formed by both, Defendants.

Civ. No. 86–0504 (JP).

United States District Court,
D. Puerto Rico.

Sept. 21, 1987.

Rafael Sánchez Hernández, Santurce, P.R., Rafael Castro Lang, José Ramón Pérez Hernández, San Juan, P.R., for plaintiffs.

Zuleika Llovet, Saldaña, Morán, Rey & Alvarado, Santurce, P.R., for defendants.

## OPINION AND ORDER

PIERAS, District Judge.

This is a civil rights action under 42 U.S.C. § 1983, in which nine plaintiffs seek injunctive relief, back pay, and damages as a result of alleged politically motivated dismissals. These plaintiffs, mostly domestic employees of La Fortaleza, the Governor's mansion, contend they were dismissed because of their political beliefs and affiliation with the New Progressive Party (NPP), in violation of the first, fifth, and fourteenth amendments to the United States Constitution. Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331 and 1343(3) and (4).

The matter was tried without a jury, where both parties presented witnesses and documentary evidence. At the start of the trial, the plaintiffs voluntarily dismissed Governor Rafael Hernández Colón from the case, leaving Franklin Martínez Monge as the only defendant. Upon conclusion of the trial, the parties submitted the case to the Court for adjudication. Based upon the evidence, and after due deliberation, the Court now makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. At the time of their dismissals, all nine plaintiffs occupied career positions with the Office of the Governor at La Fortaleza. All plaintiffs are members of the NPP. The NPP lost the general elections held in Puerto Rico on November 6, 1984,

and the control of the Executive Branch of the Commonwealth Government, which it held for the previous eight years. Their names, positions, and monthly salaries are set forth below:

| Plaintiff | Job Title | Salary p/m |
|---|---|---|
| Miguel A. Rosario Torres | Executive Officer III | $1,029.00 |
| Antonio Bello Méndez | Driver | 682.00 |
| Victor Pedraza Rosario | Driver I | 549.00 |
| José M. Torres Pagán | Messenger II | 586.00 |
| Angel M. Díaz Mila | Driver | 590.00 |
| Juan J. Claudio Morales | Warehouse Keeper | 740.00 |
| Félix Resto Nieves | Driver I | 612.00 |
| Edelmiro Loubriel Cancel | Driver I | 682.00 |
| María Soto Rodríguez | Clerk Typist II | 570.00 |

2. Defendant Franklin Martínez Monge is the Special Aide in charge of Aministration for Governor Rafael Hernández Colón. He is a member of the Popular Democratic Party (PDP), the political party whose candidate, Rafael Hernández Colón, was elected Governor of the Commonwealth of Puerto Rico in the general elections held on November 6, 1984, and who at present holds said office. He has held the position since April 1, 1985, and in that position he dismisses, employs, and makes all personnel decisions at the Office of the Governor. Defendant Martínez Monge personally made the decision to initiate an investigation of the plaintiffs' personnel files and those of other employees working at the Office of the Governor. He made the decision to separate all the plaintiffs from their career positions they occupied at the Office of the Governor. At the time he took this personnel action he did not evaluate or consider the job performance of any of the plaintiffs. He is a member of the Popular Democratic Party (PDP), and during the 1984 elections was a candidate for the position of Member of the Municipal Assembly of San Juan for the PDP.

3. On May 20, 1985, defendant Martínez Monge sent letters to each plaintiff stating that an analysis of their appointment papers revealed that they were originally recruited without fulfilling the minimum academic preparation and experience required for their respective positions, in violation of section 4.3 of Act No. 5 of October 14, 1975, as amended, and the applicable regulations. The letter continued to say that their appointments were null and void and lacked validity. The letter also stated they had the right to an informal administrative hearing so that they could state their version and to show cause why their dismissals should not proceed. The employees were granted 15 working days to request a hearing or present their reactions to the findings. After the requested hearing or after the 15 days would have elapsed without a request, he would proceed to a determination.

4. Defendant Martínez Monge selected and appointed the examiner that held the informal administrative hearing offered to plaintiffs. The examiner held hearings between June 21, 1985, and June 26, 1985, for those employees who responded to the May 20, 1985, letter. All plaintiffs requested and received a hearing except for plaintiff José M. Torres Pagán, who did not request a hearing. The hearing examiner rendered two reports to defendant Martínez Monge resulting from the hearings, dated June 21, 1985, and July 1, 1985. The examiner gave hearings to approximately fifty other government employees who were sent letters similar to the May 20, 1985, letters regarding invalid appointments. After all these hearings, in the aforementioned reports the examiner found that no employee could show cause why they should not be separated. He found that they could produce no evidence to rebut the allegations contained in the May 20, 1985, letter. Specifically, he found that some employees were not able to produce evidence that they met the minimum requirements for their

respective positions, and that all were not selected from a Register of Eligibles.

5. Five of the nine plaintiffs were accompanied by counsel to the hearings, but had no opportunity to cross-examine nor to present witnesses: Angel M. Díaz Mila, Juan J. Claudio Morales, Miguel Rosario Torres, Félix Resto Nieves, and María Soto Rodríguez. Francisca Pérez, Esq., and Mrs. Edna Morales, Director of Personnel, were present at the hearings representing the Office of the Governor.

6. All plaintiffs were selected to their career positions without having been recruited from a Register of Eligibles. However, it was determined at trial that the Office of the Governor maintained no Register of Elegibles from which it could select employees for the positions from which they were fired.

7. Twelve employees were named to probationary career positions in the Office of the Governor by the new PDP administration without having been selected from a Register of Eligibles. They were later appointed to transitory and confidence positions, and still maintain those positions.

8. Plaintiff Edelmiro Loubriel Cancel was appointed effective May 2, 1977, to the position of Driver I, No. 204, with a classification in the trust service. On July 1, 1977, he obtained position 165 also in the trust service. On January 3, 1978, plaintiff attained a probationary period for the position of Driver I, No. 165, in the career service as "reclassified". On April 2, 1978, he was given tenure in said position holding the same until the time of his separation. Loubriel Cancel's monthly salary at the time of his separation was $682.00.

9. As a Driver in the General Services Division, Loubriel Cancel would drive administrative personnel between the Governor's Office and other executive agencies. He never drove the Governor. He would sometimes deliver documents between the Governor's Office and other executive agencies. In 1978, Loubriel Cancel received an overall good evaluation of his work. In 1985, when the new administration took office, his working schedule was changed from Monday to Friday, from 7:00

a.m. to 3:00 p.m., to Wednesday to Sunday, from 3:00 p.m. to 12:00 m. At the time of his dismissal, he was employed for eight years and five months as a driver for the Office of the Governor.

10. Ernesto Sala was a supervisor of the drivers and drove defendant Martínez Monge home every day. Sala knew plaintiff Loubriel Cancel since he began work with La Fortaleza in 1978, and frequently discussed politics with him. Loubriel Cancel had a bumper sticker on his car indicating his political affiliation, and parked it in the employees parking lot, located next to their offices. Plaintiff Loubriel Cancel is now a driver for the Mayor's Office for the San Juan Municipality.

11. Plaintiff José M. Torres Pagán was appointed as Messenger I, position No. 142, in the trust service on January 17, 1977. On January 3, 1978, plaintiff attained a probationary period for the position of Messenger I, position No. 194, in the career service. He "obtained" tenure in said position on April 2, 1978. On March 16, 1981, plaintiff held another probationary period for the position of Messenger II, position No. 194, in the career service. On June 16, 1981, he "obtained" tenure in said position holding the same until the time of his separation. Plaintiff Torres Pagán's monthly salary at the time of his separation was $586.00.

12. Mr. Torres Pagán worked for the Division of Archives and Correspondence for the Office of the Governor. He worked in the offices accross from the old Justice Department Building on Fortaleza Street. His duties were to pick up and transport correspondence between different agencies of the Governor, and to pick up mail at the Old San Juan Post Office, sign for registered or certified mail, and bring it back to the headquarters office at La Fortaleza.

13. In 1981, Mr. Torres Pagán was given a probationary evaluation, and a report on the evaluation read that his work excelled in every category. On March 16, 1983, Mr. Torres Pagán was granted a raise in salary of two steps for merit pertaining to the scale that corresponds to his classification. A letter dated September

10, 1982, from former governor Carlos Romero Barceló congratulates Mr. Torres Pagán for the work he has done for La Fortaleza.

14. Mr. Torres Pagán received the May 20, 1985, letter from defendant, informing him his appointment was null and void. This was the first time he was informed that he was not eligible for the position. By letter of June 11, 1985, plaintiff requested from defendant Mr. Martínez Monge the informal hearing. None was granted. Instead, by letter dated June 14, 1987, Mr. Martínez Monge dismissed plaintiff from his position effective immediately, informing him of his right to appeal within 30 days before the Board of Appeals of the Personnel Administration System.

15. Similar functions as those performed by Mr. Torres Pagán as Messenger to career positions No. 194 are now being performed by Samuel Cirino Romero, who has occupied transitory position No. 85, as Driver, since October 1, 1985. After the new administration came to power in 1985, plaintiff Torres Pagán was accompanied by Lilliam Marrero on his post office trips. Torres Pagán was authorized to sign for mail, but Marrero would actually transport it to La Fortaleza.

16. Plaintiff Torres Pagán has been a member of the NPP for most of his life, and his supervisors were aware of his political affiliation. He took no exam for the position, and his name was not on a list of eligibles. Plaintiff was employed by La Fortaleza as a driver for eight and one half years before his dismissal.

17. Plaintiff María Soto Rodríguez was appointed to a probationary period as Clerk Typist II for position No. 183, classified in the career service, on September 16, 1981. On March 16, 1982, she "obtained" tenure in said position No. 183, holding the same until the time of her separation. Plaintiff María Soto Rodríguez' monthly salary at the time of her separation was $570.00.

18. Plaintiff Soto Rodríguez worked in the offices of Archives and Correspondence, located across from the Old Department of Justice Building, before the La Fortaleza gate. Her functions included preparing lists, typing, marking and filing mail, answering the telephone, and requisitioning materials. Her qualifications included a four-year high school diploma, a diploma as a clerk typist, and previous work experience as a clerk typist. An evaluation of March 15, 1982, indicates that her work was above average and that she excelled in some areas of work.

19. When the administration changed in 1985, plaintiff Soto Rodríguez' functions and similarly situated clerk typists' functions also changed. Where they previously had a high volume of work, no work was assigned to them. Furthermore, the telephones were subsequently taken away from the offices. After the May 20, 1985, letter from Mr. Martínez Monge, all the desks had been taken from the offices.

20. At the administrative hearing held at Soto Rodríguez' request, she was shown no documents nor given any information indicating her position was null and void. However, a review of the job requirements indicates that she met the minimum qualifications for the position. By letter dated June 12, 1985, addressed to plaintiff, defendant dismissed her from her position effective July 15, 1985, saying she had not been able to show evidence to rebut the proposition that she was illegally recruited. Similar functions to those performed by María Soto Rodríguez as Clerk Typist II in career position No. 183 are now being performed by Nelvis Rivera Echandy, who occupies position No. 61 as Clerk Typist II as of August 1, 1985. Plaintiff is currently a secretary with the San Juan Municipality.

21. Plaintiff Soto Rodríguez has been a member of the NPP for the last eight or nine years. Her co-workers and supervisors were all aware of her political affiliation.

22. Plaintiff Víctor Pedraza Rosario was appointed on December 16, 1982, to a transitory position as Driver I, in the Office of the Governor assigned to the Executive Mansion. He held that position until July 16, 1984, when plaintiff attained a probationary period as Driver, position No. 397, in the Office of the Governor at the Office of General Services. On October 16, 1984,

plaintiff "obtained" tenure in the aforementioned position classified in the career service, holding this position until the time of his separation. Plaintiff Víctor Pedraza Rosario's monthly salary at the time of his separation was $549.00.

23. Plaintiff Pedraza Rosario applied for the position at the Governor's Office in 1982, by filling out an application with the Personnel Office. After some two months, plaintiff was interviewed at the Personnel Office. The interviewer inquired whether he had any experience as a driver. About three weeks later, police officers questioned persons in his neighborhood, saying it was in connection with his application for a job with La Fortaleza. He was later hired and assigned as a driver at the General Services Division, located at El Morro. Amongst other duties, plaintiff would transport communications or releases to the news media. He would also transport cooks, along with their culinary delights for the Governor, from La Fortaleza Mansion to the Condominium Belén.

24. Plaintiff Pedraza Rosario was not aware of any irregularities in his appointment until he received the May 20, 1985, letter from Mr. Martínez Monge. At the hearing held at his request, plaintiff was not shown any documents nor given any information indicating any problems with his appointment. He was terminated, effective July 15, 1985, by Mr. Martínez Monge.

25. Mr. Pedraza has been a member of the NPP since 1980 and has publicly demonstrated his political affiliation. He has displayed banners in his home, located on the roof and inside the house, as well as pictures of himself and the former governor in his locker at his offices in the General Services Division. In addition, most of his co-workers and supervisors knew of his political affiliation. Plaintiff saw many of his supervisors together at various times with defendant, Mr. Martínez Monge.

26. Plaintiff Félix Resto Nieves was employed on March 16, 1979, as Janitor, position No. 230, at the Office of the Governor under a probationary appointment in the career service to end on June 15, 1979.

This position was "reclassified" and plaintiff held a probationary position for three months from May 16, 1979, to August 15, 1979, for the position of Driver I, position No. 230. On August 15, 1979, he "obtained" tenure in said position in the career service. Resto Nieves held this position as driver in the Office of the Governor until the time of his separation. Plaintiff Félix Resto Nieves' monthly salary at the time of his separation was $612.00.

27. Plaintiff Resto Nieves was a driver in the General Services Division, assigned to the Purchasing Department. His duties included purchasing previously ordered merchandise from stores and delivering it to the person who made the order. He was employed as a driver in the General Services Division for approximately five and a half years. On May 15, 1979, plaintiff was given an above average evaluation of his work performance. He received two salary increases due to merit on April 28, 1983, and August 29, 1984.

28. Similar functions as those performed by Mr. Resto Nieves as driver in career position No. 230 at the General Services Division at the Office of the Governor are being performed by Luis Osorio Aponte, who has occupied career position No. 232 since April 17, 1980, who is a member of the PDP. Plaintiff has been a member of the NPP since its foundation.

29. At a hearing held at plaintiff Resto Nieves' request, following the May 20, 1985, letter from defendant, plaintiff was not shown documents nor was he told what irregularities existed in his appointment. He has an eighth-grade educational level, and his OP–16 job classification form reads that the position requires a ninth-grade educational level. Defendant Martínez Monge dismissed plaintiff effective July 15, 1985.

30. Plaintiff Antonio Bello Méndez was appointed on April 1, 1977, to the Office of the Governor, as a Driver I, position No. 205, in the trust service. On April 2, 1978, he was assigned a career-type position No. 166, as driver in the Office of the Governor, General Services Division, until the time of his separation. Plaintiff Antonio

Bello Méndez' monthly salary at the time of his separation was $682.00.

31. Bello Méndez' duties as a driver included transporting press releases to the news media as well as transporting correspondence to different agency heads. During his eight-and-a-half-year period of employment at the Governor's Office, he received an evaluation in 1978, evaluating his work performance as well above average. In 1984 he received a merit increase in pay. He has been a member of the NPP for most of his life, and supervisor Ernesto Salas was aware of his political affiliation. Plaintiff was dismissed effective July 15, 1985, by defendant Martínez Monge.

32. On cross-examination, it was revealed that, like his fellow driver Mr. Pedraza, Mr. Bello, as part of his duties, would deliver meals from La Fortaleza to Ponce, for Governor Rafael Hernández Colón. Almost every day for some two months or more he would take two separate trips for lunch and dinner to Ponce, by himself. In Ponce it seems, the Governor had personnel who prepared breakfast for him. Not surprisingly there were other drivers who performed the meals on wheels shift in his absence. It was further revealed on cross-examination that, upon the change in the administration, Bello Méndez' day shift was changed to the night shift.

33. Plaintiff Angel M. Díaz Milá, was employed as a driver position No. 227, in the Office of the Governor, since August 16, 1978, officially assigned to the General Service Division. On November 16, 1978, he "obtained" tenure in said position. Plaintiff Angel M. Díaz Milá's monthly salary at the time of his separation was $590.00. In his seven-and-a-half-year occupation as a driver, his duties included purchasing food from orders of the cook for La Fortaleza. A probationary evaluation shows that his work was well above average.

34. Plaintiff Díaz Milá has been a member of the NPP for over twenty years and has had a sticker on his car for the past 10 years indicating his affiliation. Defendant Martínez Monge, seeing the sticker, ordered him to take his car out of the employee parking space, and accordingly, plaintiff Díaz Milá took the sticker off his car. The OP–16 form for a driver requires a ninth-grade educational level, and plaintiff completed the eighth grade. Plaintiff has had a driver's license for some twenty years.

35. Plaintiff Juan J. Claudio Morales was appointed to the Office of the Governor on March 16, 1977, as Clerk II, position No. 114, classified in the trust service in the Division of General Services. On July 1, 1977, he was assigned to position No. 147, as Warehouse Keeper, due to a "reclassification" in the position. On January 3, 1978, this position was classified as in the career service and plaintiff "obtained" tenure in said position on July 3, 1978, holding the same until the time of his separation. Plaintiff Juan J. Claudio Morales' monthly salary at the time of his separation was $740.00.

36. Mr. Claudio Morales had four to five years' previous experience as a warehouse keeper before working at the Office of the Governor, where he maintained his position for eight years and three months before being dismissed. As a warehouse keeper, he was in charge of everything relating to purchasing office supplies, from coffee cups to janitorial materials.

37. On March 15, 1979, plaintiff Claudio Morales received a good evaluation of his work performance, and on August 30, 1984, he received a merit-based salary increase. He has been a member of the NPP since its foundation and travelled with the former Governor on the weekends for conferences and other activities. He maintained a bumper sticker on his car for some six years indicating his political affiliation. Plaintiff parked his car at the parking lot assigned to the La Fortaleza employees. When the PDP took control, plaintiff's parking space was taken, on instructions of Mr. Martínez Monge. In addition, he was no longer able to open the warehouse with the key assigned to him, because a different lock had been placed on the warehouse door. He was dismissed, effective July 15, 1985, by Mr. Martínez Monge.

38. Plaintiff Miguel A. Rosario Torres worked in the Office of the Governor at La

Fortaleza since February 16, 1979. He held the position of Administrative Clerk I ("Técnico de Administración I") in the trust service since February 16, 1979, to September 30, 1979. From October 1, 1979, to July 15, 1980, plaintiff held the position of Administrative Clerk I ("Técnico de Administración I") in the career service. From July 16, 1981, to June 30, 1982, plaintiff held a position classified in the trust service as Administrative Assistant III ("Auxiliar Administrativo III"). On July 1, 1982, plaintiff occupied the position of Executive Officer III ("Funcionario Ejecutivo III") in the career service, until the time of his separation, on July 15, 1985. Plaintiff Miguel A. Rosario Torres' monthly salary at the time of his separation was $1,029.00.

39. As Executive Officer III, plaintiff Rosario Torres worked with the maintenance, print shop, property, and workhouse personnel, largely in the maintenance and service of equipment. Additionally, his co-workers selected him to be their representative on the participation committee, which planned cultural, recreational, and social activities. His offices were located outside the gates of La Fortaleza, at La Casa de Doña Fela, at Caleta Street.

40. On August 8, 1984, plaintiff Rosario Torres was granted a two-step, merit-based salary increase. A twenty-year member of the NPP, he maintained a bumper sticker on his car indicating his affiliation, which he parked across from El Morro at La Fortaleza employee lot. When the new administration took office, the lock was changed on his office and he was transferred to a different office, assigned only to functions regarding the inventory of property.

41. The requirements for the position of Executive Officer III are two years of college and four years of office work, or equivalent experience plus a high school diploma. Plaintiff graduated from high school, and had two years' office, administrative and supervisory experience, and similar work experience for La Fortaleza for over 10 years before being appointed to his position as Executive Officer III. Similar functions to those performed by Miguel Rosario Torres in career position No. 142, as Executive Officer III, are currently being performed by Mr. Román Efraín Figuera, in position No. 145, as Executive Officer II, in a career position.

42. Edna Morales Ruiz is the Director of Personnel at La Fortaleza, and a witness for the defendant. She also has been a municipal assemblywoman for Toa Baja for the PDP, since January 14, 1985. From 1978 to 1981, she worked at the Office of the Governor under the NPP administration. On February 16, 1981, she was transferred to the Treasury Department, and she appealed the transfer to the JASAP (Appellate Board of the Personnel Administration System), alleging it was a politically motivated transfer. Her attorney before the appeal board was Mr. Carmelo Guzmán Geigel, who was also the hearing examiner for the plaintiff's informal hearing and who rendered the report following all the hearings. He was appointed examiner by defendant Martínez Monge. Morales Ruiz was named or appointed to her position as Director of Personnel, after the PDP won the election in 1984, without having been selected from a Register of Eligibles, and for this career position she did not take an exam. Ms. Morales on cross-examination said that the Governor's Office does not maintain a list of eligibles, stating "I haven't found any register or list of eligibles in the files." She further admitted that the Governor's Office has not followed the personnel regulations requiring that a transitory employee filling a permanent position for reasons of urgency or lack of appropriate registries may occupy that position for a maximum of ninety days. There are transitory employees who have occupied career positions for about two years.

43. Defendant Martínez Monge investigated the background of employees at La Fortaleza to determine whether they had been selected from a list of eligibles and whether they had met the educational and experience requirements for each position. On finding that these plaintiffs and other employees were not selected from a register of eligibles, indeed, there was no register, and/or that they did not have the requisite experience or educational require-

ments, he sent the May 20, 1985, letter stating that their positions were null and void, and informing them they could have an informal hearing if requested within fifteen days.

44. The Governor has his own drivers at the Executive Mansion, and none of the plaintiffs herein ever drove the Governor. The drivers employed by the General Services Division do not drive the Governor.

45. The Committee that held the informal hearing consisted of attorney Carmelo Guzmán, the hearing examiner, who was appointed by defendant Martínez Monge. Mr. Guzmán, once held a high-ranking position in the OCAP (Central Office of Personnel Administration) in the prior administration of Governor Hernández Colón (1972–1976). Additionally, he represented Edna Morales in the appeal before the JASAP of her transfer from her position in the Governor's Office to the Department of the Treasury (see ¶ 42, above). Francisca Pérez is an attorney who was appointed to the Citizen's Office within the Office of the Governor by Hernández Colón. She also participated on the committee and is a member of the PDP.

46. Mr. Martínez Monge, in his dismissal letters to plaintiffs, granted plaintiffs the right to appeal their discharges to JASAP. Mr. Nelson Cordero, an appointee of Hernández Colón, at the time of the dismissal was the President of JASAP.

47. The following is a list of employees that currently occupy positions as drivers at the General Services Transportation Pool and the Archives and Correspondence Division of the Office of the Governor:

| Name | No. of Position | Date of Appointment |
|---|---|---|
| Alexis Martínez Santana | TR–38 | February 6, 1986 |
| José Meléndez Vázquez | TR–40 | July 8, 1985 |
| José Colón Rodríguez | TR–116 | August 1, 1985 |
| Ismael Santiago Cruz | TR–21 | February 6, 1986 |
| Ramón Agueda Rodríguez | TR–188 | January 5, 1987 |
| Francisco Hernández Rodríguez | TR–78 | February 6, 1986 |
| Darío García O'Neill | TR–80 | September 5, 1985 |
| José A. Figueroa Cruz | TR–84 | September 3, 1985 |
| Ernesto Sala Ayala | 164 | May 2, 1968 |
| Juán E. Rivera Laureano | 221 | April 17, 1979 |
| Carmelo Delgado Rodríguez | 228 | March 16, 1979 |
| Luis F. Osorio Aponte | 232 | April 17, 1980 |
| Samuel Cirino Romero | TR–85 | October 1, 1985 |

The persons named to transitory positions perform similar functions to the ones performed by plaintiffs Antonio Bello Méndez, Víctor Pedraza Rosario, Angel M. Díaz Milá, and Edelmiro Loubriel Cancel.

48. The parties stipulated that there were fourteen persons currently holding career positions at the Office of the Governor and appointed prior to 1985. They were not selected from a Register of Eligibles, nor were they fired by the Office of the Governor. They are listed as follows:

| NAME | POSITION & NO. | DATE OF APPOINTMENT |
|---|---|---|
| Víctor Martínez Rivera | Adm. Clerk IV–133 | March 16, 1984 |
| Elida Temporini Ruggeri | Adm. Clerk – 454 | January 3, 1984 |
| Carmelo Delgado Rodríguez | Driver – 228 | March 16, 1979 |
| Felipe Silva Casanova | Janitor – 299 | March 17, 1981 |
| Alredo García Febus | Clerk I – 153 | July 2, 1979 |
| Víctor Colón Figueroa | Janitor – 301 | March 16, 1981 |
| Juan Meléndez Santiago | Janitor – 370 | August 16, 1983 |
| José Torres Valentín | Janitor – 367 | August 1, 1983 |

| NAME | POSITION & NO. | DATE OF APPOINTMENT |
|---|---|---|
| Reinaldo Rodríguez Centeno | Janitor – 368 | August 1, 1983 |
| Edwin Vélez Soto | Janitor – 369 | August 1, 1983 |
| Ismael Agueda Agosto | Janitor – 248 | July 18, 1978 |
| Jorge Rojas Benítez | Janitor – 245 | July 18, 1978 |
| José O'Farril Reyes | Janitor – 247 | July 18, 1978 |
| Angel Pizarro Feijoó | Janitor – 399 | July 1, 1983 |

49. The parties further stipulated that there are ten employees currently holding career positions at the Office of the Governor, but were not selected from a Register of Eligibles, nor did they possess all of the classification requirements for their respective positions, with the exception of Ivonne García Barros. They were sent letters by defendant Martínez Monge similar to those sent on May 20, 1985, to plaintiffs, but were not dismissed from their positions. They are listed as follows:

| NAME | POSITION & NO. | DATE OF APPOINTMENT |
|---|---|---|
| Luis F. Osorio Aponte | Driver – 232 | April 17, 1980 |
| Victoria Gómez Castro | Assistant Public Prosecutor – 336 | November 1, 1977 |
| María V. Osorio Escobar | Clerk IV – 290 | August 1, 1979 |
| María M. García Santiago | Clerk Typist III – 179 | January 17, 1977 |
| Juan E. Rivera Lureano | Driver – 221 | April 17, 1979 |
| Marta Pérez Pagán | Assistant Public Prosecutor – 138 | January 2, 1980 |
| Jorge Ortíz Candelaria | Driver – 392 | July 1, 1983 |
| Ivonne García Barros | Telephone Operator – 152 | March 16, 1977 |
| Nelson Matos Torres | Driver – 292 | February 17, 1981 |
| Wanda V. Rosa Acevedo | Telephone Operator – 269 | March 1, 1984 |

50. The Court finds as a matter of fact and by a preponderance of the evidence, that the defendant intentionally, willfully, and maliciously violated the plaintiff's first amendment and fourteenth amendment rights in dismissing them from their career positions and providing them with sham due process hearings to oppose their imminent firings. The uncontradicted evidence shows that the defendant knew of the plaintiffs' political affiliation with the NPP, and that this was the motivating reason for the discharges. The defendant personally made the decision to fire all of the plaintiffs. As was stipulated, many career employees of the Office of the Governor appointed prior to 1985 and who were not selected from a register of eligibles nor possessed all of the classification requirements still maintain their positions. Further, the new PDP administration appointed employees, many identified as PDP members, for driving and clerical positions in the Office of the Governor. These new employees were not selected from a register of eligibles, nor did they all possess the minimum classification requirements for the jobs. The defendant's conduct was egregious in that he attempted to use the legal process to legitimize the illegal firings: the decision to fire the plaintiffs was carved in stone well before the sham hearings were conducted.

At the time of their firings, the law was clear that drivers and clerical workers could not be dismissed so callously. Defendant's disguising his political motivation by using the legal process against the plaintiffs was a conscious disregard for their civil rights.

51. The uncontradicted evidence establishes the mental distress suffered by plaintiffs. Each plaintiff testified that he or she suffered sleeplessness, anxiety, and humiliation because of the firings. Their financial credit in the community was adversely affected. Their ability to provide the economic support for their families' sustenance was similarly affected. Some are the sole wage earners for their households. They were forced to seek other employment and explain to future employers the

humiliating reason for their job search. Each plaintiff is therefore entitled to $10,-000.00 in compensatory damages.

52. The evidence established that the plaintiffs are entitled to back pay as follows:

a) *MIGUEL ROSARIO TORRES:* At the time of his dismissal on July 15, 1985, he was earning $1,029.00 per month. He was unemployed for one month, resulting in a loss of income of $1,029.00. He was employed from August 16, 1985 to October 1, 1985, at the Toa Baja Municipality with a monthly salary of $700.00, resulting in a $329.00 loss of income for that period. He worked from September 16, 1985, to September 30, 1985, at $10.96 per day for a pro-rated loss of $153.44. From October 1, 1985 to June 1, 1986, he worked at $375.00 monthly for a total loss of $5,886.00 during that nine-month period. Finally, from June 2, 1986, to the date of trial, he earned $825.00 monthly, resulting in a monthly loss of $1,507.20. Defendant owes plaintiff Miguel Rosario a total of $8,904.64 in back pay.

b) *MARIA SOTO RODRIGUEZ:* Her monthly salary at the time of her dismissal, July 15, 1985, was $570.00, or $19.00 daily. For three months and sixteen days she was unemployed, resulting in a loss of $2,019.00. From November 1, 1985, to July 15, 1986, she was employed at the San Juan Municipality at a salary of $511.00 per month, resulting in a loss of $501.40 for that period. From July 15, 1986, to January 16, 1987, she was employed at a monthly rate of $555.00, resulting in a loss of $90.00 for that period. Defendant owes María Soto Rodríguez a total of $2,605.40 in back pay.

c) *ANTONIO BELLO MENDEZ:* His monthly salary at the date of his July 15, 1985, dismissal was $682.00. Mr. Bello was unemployed from July 15, 1985, to February 15, 1987, resulting in a loss of income of $12,958.00. He has been employed since February 16, 1987, to the date of trial, with a monthly salary of $545.00. His back pay award is $13,059.00.

d) *ANGEL M. DIAZ MILA:* His monthly salary at the time of his July 15, 1985,

firing was $590.00. He was unemployed from the date of his firing until January 15, 1987, resulting in a loss of $10,620.00 in income. He has been employed since January 16, 1987, with a monthly salary of $500.00. His total back pay award is $10,-800.00.

e) *JUAN CLAUDIO MORALES:* He earned a monthly salary of $740.00 at the time of his July 15, 1985, dismissal. He was unemployed from that date until October 1, 1986, resulting in a loss of income of $10,754.66. He has earned a monthly salary of $780.00 since October 2, 1986. His back pay award is $10,754.66.

f) *FELIX RESTO NIEVES:* He earned $612.00 monthly at the time of his July 15, 1985, dismissal. From that date until May 15, 1986, he was unemployed, resulting in a loss of income of $6,120.00. Since May 16, 1986, he has earned a monthly income of $730.00. His total back pay award is $6,120.00.

g) *VICTOR PEDRAZA ROSARIO:* He earned a monthly salary of $549.00 at the time of his July 15, 1985, dismissal, and has been unemployed since. His total back pay award to the date of trial is $10,980.00.

h) *JOSE TORRES PAGAN:* He earned a monthly salary of $586.00 at the time of his July 15, 1985, dismissal. From that date until March 15, 1986, he was unemployed, resulting in a loss of $4,688.00. He has been employed since April 3, 1986, at a monthly salary of $536.00. His total back pay award is $5,288.00.

i) *EDELMIRO LOUBRIEL CANCEL:* He was earning a monthly salary of $682.00 at the time of his July 15, 1985, dismissal. He was unemployed from that date until February 9, 1986, resulting in a loss of $4,637.52 in income. He was employed since February 10, 1986, to the date of trial, earning $510.00 monthly, for a total loss during that period of $2,249.62. His total back pay award is $6,887.14.

### CONCLUSIONS OF LAW

Plaintiffs claim they were dismissed because of their political affiliation and were denied due process and equal protection of

the laws in violation of the first, fifth, and fourteenth amendments to the United States Constitution. The defendant claims that their career appointments were illegal under the Personnel Act and applicable regulations, that they were granted informal hearings prior to their dismissals, though they were unnecessary, and that he is entitled to qualified immunity.

### 1. *Procedural Due Process*

■ The Due Process Clause of the fourteenth amendment guarantees public employees with a property interest in continued employment the right to an informal hearing prior to being discharged. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494, 503–504 (1985). A property interest in continued public employment may be created by "existing rules or understandings that stem from an independent source such as state law." *Loudermill,* 470 U.S. at 538, 105 S.Ct. at 1491, 84 L.Ed.2d at 501. While state law governs the creation of the property interest, the question of the process due is a matter of federal law. *Loudermill,* 470 U.S. at 541, 105 S.Ct. at 1492–93, 84 L.Ed.2d at 503.

All plaintiffs were career employees as defined by Puerto Rico's Public Service Personnel Act. 3 L.P.R.A. § 1301, *et seq.* Career employees may be removed only for "good cause, after preferment of charges in writing." 3 L.P.R.A. § 1336(4) (Supp. 1986). Career employees, as opposed to confidential employees, have a property interest in continued public employment.

The defendant argues that the plaintiffs' positions were null and void ab initio because they were hired to career positions in violation of the Personnel Act and the Personnel Regulations of the Office of the Governor, and therefore, they did not acquire any property interest in their employment and no right to due process. Specifically, defendant contends that plaintiffs were not selected from a Register of Eligibles, did not take an exam for each position and/or did not meet the minimum requirements for each position. Notwithstanding, defendant claims he offered plaintiffs fair and informal administrative hearings prior to their separation.

The Office of the Governor is an Individual Administrator under sections 1341 and 1343 of Title 3, the personnel law. The Office issued Personnel Regulations for its employees at La Fortaleza approved by the OCAP on January 3, 1978, pursuant to 3 L.P.R.A. § 1347. The foreword of the regulations indicates they are promulgated and implemented in furtherance of and on areas essential to the merit principle. The regulations contain provisions for the hiring of career employees. Specifically, section 7.4 requires applicants to compete through written, oral, physical, or performance examinations. Those applicants who pass the examination are placed on a register of eligibles, ranked according to their examination grades. Section 7.5.1. Whenever the Office of the Governor does not have a register of eligibles available, it may use the corresponding registers maintained by the OCAP or any other individual administrator. Section 7.5.4. Under section 7.6, vacancies are to be filled through the Register of Eligibles. The Personnel Division certifies to the division maintaining a vacancy the first five names that appear on the appropriate register. Section 7.6.5(a).

■ Public employees hired "illegally" to career positions have no property interest or expectation to continued employment, and therefore, no entitlement to due process prior to termination. *Liliana Laboy v. ELA,* 84 JTS 23 (1984); *Colón v. Mayor of the Municipality of Ceiba,* 112 P.R.R. 934 (1982); *Guerra García v. Sec. of Dept. of Social Services,* 113 P.R.R. 66 (1982); *Ortíz Rosa v. Mayor of Municipality of Aguadilla,* 107 P.R.R. 890 (1978); but *cf. Soto v. Mayor of Municipality of Bayamón,* 99 P.R.R. 404 (1970) (failure of all formalities in the appointment not decisive). Those public employees, though they are filling career positions, may be discharged at any time as if they were trust employees, with the exception that the dismissal may not be politically motivated. *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574; *Elrod v.*

*Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

In *Kauffman v. Puerto Rico Telephone Co.,* 674 F.Supp. 952 (D.P.R.1987), eleven former employees of the Puerto Rico Telephone Company (PRTC) claimed that politically motivated dismissals violated their first amendment and due process rights. On a motion for summary judgment, the Court dismissed ten of their eleven due process claims, holding that their appointments were illegal and therefore without entitlement to due process protections prior to termination. However, both procedurally and substantively, the *Kauffman* case stands in stark contrast to the case at hand.

In *Kauffman,* a group of PRTC employees formed to protest what they claimed was a violation of the recruitment regulations in hiring those plaintiffs. The plaintiffs were hired between 1983 and 1984, just subsequent to a Puerto Rico Supreme Court mandate that the PRTC adopt personnel regulations consistent with the merit principle. The plaintiffs were recruited from outside of the PRTC in violation of the newly adopted regulation requiring first consideration to internal employees. The protest began shortly after the appointments and put these plaintiffs in quick notice of some irregularity with their appointments.

In contrast, the employees here knew nothing of their allegedly illegal appointments until the May 20, 1985, letter from defendant Martínez Monge. The uncontradicted evidence at trial showed each plaintiff filled out an application for employment with the Office of the Governor, and after an interview, was hired for the position from which each was subsequently discharged. These plaintiffs performed their duties without reproach but rather with strong approval for effective performance of work periods ranging from three to nine years. They are messengers, drivers, and typists, unfamiliar with the bureaucratic procedures by which one obtains employment with the Commonwealth government. They did not take an exam, not knowing an exam was required of them. The Commonwealth produced no exam that had ever been administered to these classifications of employees. It did not show that the plaintiffs knowingly or willfully violated these personnel regulations. Yet the aspect of this defense that strains credulity is the Commonwealth's admission on cross-examination that the Governor's Office has never maintained a Registry of Eligibles. Consistent with that fact is the plain inference that exams, written or oral, were routinely not given for such employment positions.

The merit principle is the strength behind the Personnel Act and its corresponding regulations. However, throughout two administrations represented by both of the island's prominent and rivaling political parties, the personnel regulations for the classifications of these employees have rested virtually ignored. The NPP administration did not maintain the Register of Eligibles, and the PDP fires those employees hired by the NPP. But the PDP replaces those employees with its own employees who do not come from a list of eligibles and who do not possess the minimum qualifications. This forces the conclusion that the Commonwealth government does not view these regulations necessary to promote the merit principle. Indeed, plaintiffs' job performance was exemplary: each was awarded some recognition for their work, either in salary or in commendation. While some may have fallen a year shy of the high school educational requirement, they all had proper work experience before assuming their positions. And if the Commonwealth is willing to ignore these regulations and requirements, this Court will not use them to penalize these workers. Plainly, the Commonwealth government, in both administrations, ignored these regulations. It was not these plaintiffs that ignored the regulations. It is the fault of the Commonwealth, not the plaintiffs, that no exams were given, and no Register of Eligibles was maintained. In *Guerra,* the Puerto Rico Supreme Court said that if the "employees entered the public service without having to comply with the merit system require-

ments, he may not later claim the protection of the system at the time of his dismissal." 113 P.R.R. at 70. Conversely, if the Commonwealth fails to comply with the merit system requirements, it may not use its failure as a sword to discharge faithful and efficient employees. Here, as a matter of fact, the Commonwealth (now by the new PDP administration) continues to the present its disregard of the merit system requirements.

Furthermore, the new PDP administration substituted plaintiffs with other drivers and clerical workers who were not selected from a list of eligibles nor did they maintain the minimum classification requirements for their position. This defendant would like the Court to find that the plaintiffs were illegally hired, when in fact they were hired in the same manner in which their replacements were hired. Equity dictates that the defendant be disallowed from discharging plaintiffs on the same grounds under which the new administration hired their replacements. The present administration's practice of firing NPP employees for failure to comply with the merit principle and its own admitted failure to comply with the merit principle in replacing the plaintiffs coupled with the political animus violate the rights of citizens as consigned in the Constitution of the United States. This Court refuses to accept the inequitable defense advanced by Mr. Martínez Monge. The illegal replacement of plaintiffs' substitutes legitimizes the plaintiffs' original employment. As is analyzed under the first amendment claim, *infra,* the subsequent illegal replacements neutralizes the illegality of plaintiff's hiring as any sort of defense.

This conduct shows that both administrations have no regard for efficient administration of governmental services. The concept of ethics in government is overshadowed by the concern for reelection and the struggle to promote one's own political beliefs and personal interest. The only legitimate reason to seek election to public service is to promote the general welfare by serving all of the people. The facts in this case demonstrate that the leaders of both administrations have lost sight of that goal and have become only interested in serving the short-term needs of members of their own political party. They seek reelection, and not public service. Through this conduct Puerto Rico is close to falling from its constitutional pedestal into the abysm of a community of men instead of laws.

■ This Court finds for the above reasons that the plaintiffs' appointments were not illegal, and not null and void. Rather, their appointments to career positions created an expectation of continued employment. The next question is what process was due. To answer that, reference is made to federal law, and minimum procedural requirements may "not be diminished by the fact that the state may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action." *Loudermill,* 470 U.S. at 541, 105 S.Ct. at 1492–93, 84 L.Ed.2d at 503, *quoting Vitek v. Jones,* 445 U.S. 480, 491, 100 S.Ct. 1254, 1263, 63 L.Ed. 2d 552, 563 (1980). At a minimum, plaintiffs had a procedural due process right to "some kind of hearing" prior to their removal. *Loudermill,* 470 U.S. at 542, 105 S.Ct. at 1493, 84 L.Ed.2d at 504.

■ There are three elements generally required of this hearing. First, there must be oral or written notice of the charges against the employee to be terminated. Second, there must be an explanation of the substance of the relevant supporting evidence against the employee. Finally, the employee must be given the opportunity to present his side of the story. *Brock v. Roadway Express,* — U.S. —, 107 S.Ct. 1740, 1749–50, 95 L.Ed.2d 239, 250 (1987). These procedures are necessary to prevent "the risk of an erroneous termination." *Loudermill,* 470 U.S. at 543, 105 S.Ct. at 1494, 84 L.Ed.2d at 504.

■ While the pretermination procedures employed by defendant carried the superficial indicia of compliance with minimum procedural due process requirements, they were nothing more than sham process paying lip service to federal law. One need not perform a microscopic examination of the hearings and parties involved to con-

clude that they were conducted with a keen political bias. The hearing examiner was himself a member of the PDP, and a former high-ranking member of OCAP. His appointing authority, defendant, claims not to have known of his political background. He represented Edna Morales in her appeal before JASAP charging a political based transfer. Edna Morales, herself, not selected from a Register of Eligibles in her career position as Personnel Director, was also a member of the Committee. Finally, Francisca Pérez, a member of the PDP and appointed to the Citizen's Office of the Governor's Office, was also a participant.

Furthermore, although plaintiffs were given some kind of opportunity to respond to the charges, neither was advised of what irregularity existed in their appointments, and neither was shown any documents supporting the illegality of the appointments. Moreover, neither was given the opportunity to cross-examine nor present witnesses. Interestingly, though, the final dismissal letters stated that the plaintiffs were unable to rebut the evidence of their illegal appointments.

In the midst of this, the hearing examiner could see the writing on the wall. In his report of the hearings he stated the following:

> Special attention should be given to Attorney Pérez Hernández' statements as to alleged appointments that have been made for employees who belong to the Popular Democratic Party after January 2, 1985, without having been given exams nor certified in the Register of Eligibles. If he can prove that this statements are correct, I recommend that the action announced in the letter dated May 20, 1985 not be carried out. The reasons expressed in said letter could not validly sustain the action of nullifying the appointments of some employees, while the practice which is to be corrected continues. The doctrine of "Manos Limpias" ("Clean Hands") is applicable to all these cases. Any action of separation from employment finally decreed against any employee for violation of Section 4.3 of Public Law Number 5 of October, 1975, as amended and its Regulations, would

be challenged successfully before the Courts.

The record adequately reflects that the new administration appointed to similar jobs PDP members who were not given exams and who were not certified in the Register of Eligibles. This is perhaps the most conclusive evidence that the hearings were conducted more with political bias than with an eye towards satisfaction of minimum due process and a prevention of erroneous termination.

Accordingly, the Court finds that defendant did not meet the minimum procedural due process required by *Roadway Express* and *Loudermill,* and concludes that defendant violated plaintiffs' rights under the fourteenth amendment.

### 2. *First Amendment*

■ The evidence amply supports a finding that these plaintiffs were dismissed solely because of their political affiliation with the New Progressive Party. The evaluations of plaintiffs' work performance are commendable, with several having received pay raises and letters of commendation for outstanding work. It was stipulated that many of the career employees of the Office of the Governor appointed prior to 1985 who were not selected from a register of eligibles nor possessed all of the classification requirements are still working. Still others, members of the PDP, performing tasks similar to plaintiffs', are still employed with the Governor as career or transitory employees.

This case stands in contrast to *Santiago Correa v. Hernández Colón,* 637 F.Supp. 1159 (D.P.R.1986). In *Santiago Correa,* the five plaintiffs were confidence or trust employees of La Fortaleza, and three were domestic employees, janitors, gardeners, or cleaning persons. However, these plaintiffs worked inside the Executive Mansion of the Governor, both in the office area of the Governor and aides, and in the living quarters of La Fortaleza. After a bench trial, the Court ruled that though political affiliation was immaterial to the effective performance of the position, consideration

of trust and loyalty led to the conclusion that their discharges did not violate the constitution, even if political affiliation did have a role in the decisions to dismiss.

Similar to this case is *Vázquez Ríos v. Hernández Colón*, 819 F.2d 319 (1st Cir. 1987). In *Vázquez Ríos*, the First Circuit held, on an interlocutory appeal from a denial of motion for summary judgment, that the defendants were not entitled to qualified immunity against claims of political discharge by domestic employees of La Fortaleza. The defendants argued that inasmuch as plaintiffs were not policymakers, they were confidential employees that could be dismissed according to the *Branti–Elrod* principle. The Court said that the employees, largely maids and waiters, did not work exclusively within the Governor's working area, but by chance may pass by "the Governor's private belongings, working papers, matters in process—and the detritus of the day as well." 819 F.2d at 324. A distinction must be made between those employees whose jobs *"intrinsically* place them in a confidential position relative either to policymakers or the policymaking process, and those whose jobs merely permit an *incidental* exposure to sensitive material that is in fact beyond the bounds of their employment." *Id.* (emphasis in original). In dicta, the Court recognized that there may be employees who maintain positions of such "unusually intimate propinquity" that they may be cloaked with the "confidential" exception requiring political loyalty. 819 F.2d at 324.

As in *Vázquez Ríos*, these employees here are not by the entrinsic nature of their employment placed in such physical proximity to the governor as to allow them access to secret and sensitive information. Neither of the employees worked within the Governor's office, nor in an office of a Governor's aide. Rather, they worked outside of the Executive Mansion, across the street, in a completely different building. As to those employees who carried documents between agencies, the vast majority of documents transported were press releases or other nonsensitive information. If a comparison can be made between the domestic employees at *Santiago Correa,*

*Vázquez Ríos,* and here, the employees herein maintained the farthest distance from the Governor's working offices and were least able to have any access to sensitive information or communications. It must be remembered that the employees in the above cited cases were trust employees, and the workers here held the career status; though these labels are not controlling, they may be considered in deciding the confidentiality issue. In a nutshell, these employees, having no confidential status, cannot be said to require the same political affiliation as the party in power. *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 99 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

Plaintiffs contend that their political affiliation was the substantial and motivating factor in Martínez Monge's decision to discharge them. The Court concludes that plaintiffs have strongly made this showing. Under *Mt. Healthy* the burden shifts to the defendant to show, by a preponderance of the evidence, that Martínez Monge would have reached the same decision to discharge even in the absence of plaintiff's constitutionally protected conduct, i.e., even in the absence of plaintiff's political affiliation. *Mt. Healthy City School v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).

Martínez Monge attempted to make this showing by providing an alternative rationale for the discharge of plaintiffs. This independent reason, Martínez Monge hoped, would demonstrate by a preponderance of the evidence that he would have reached the same decision to discharge plaintiffs even in the absence of considerations of plaintiffs' constitutionally protected conduct, i.e., even in the absence of considerations of their political affiliation. The independent reason Martínez Monge offered was that plaintiffs were illegally hired, that they were drawn into La Fortaleza without ever appearing on the List of Eligibles. By discharging these pretenders to the labors of the Governor's palace, Martínez Monge would be upholding the finest aspirations of the merit principle and

the civil service in Puerto Rico. This was Martínez Monge's independent reason. The decision to discharge these illegally hired persons, precisely because they were illegally hired, would be made even absent plaintiffs' constitutionally protected conduct, i.e., even absent their political affiliation.

The Director of Personnel for the Governor's Office admitted, however, that the Governor's Office has never, and does not now, maintain a List of Eligibles. Persons that replaced plaintiffs after the latters' summary dismissals, did not meet the minimum qualification requirements for the job nor were they chosen from a list of eligibles as required. This makes impossible any finding of fact that the purported illegality of plaintiffs' hiring was a reason for their subsequent discharge. If legality of hiring practices had been a concern of Martínez Monge, he would not have allowed the replacement of the plaintiffs with similarly illegally hired workers. Martínez Monge's claim that he was entitled to fire these "illegally hired" NPP–member plaintiffs vanishes in the face of the subsequent "illegal hiring" of their replacements and retention of other "illegals".

The subsequent illegal hirings and retentions completely *neutralize* the *Mt. Healthy* defense. The Court must conclude that Martínez Monge's proffer of an independent reason for the discharge of the plaintiffs, that they were illegally hired and must be dismissed, is nothing more that a paltry subterfuge for the sole remaining reason why he discharged the plaintiffs: plaintiffs were engaging in the constitutionally protected activity of belonging to a political party. Unfortunately for plaintiffs, theirs was not the party in power. The employment of the many of those who stayed working as well as of new employees who substituted the plaintiffs was as illegal as the original employment of plaintiffs. The only difference was their political affiliation. There is no *Mt. Healthy* defense here. Martínez Monge simply in-vented a reason to justify the violation of the first amendment rights of the plaintiffs. That reason was made transparent by the subsequent hiring of replacements with exactly the same recruiting defect. Martínez Monge did not apply that reason evenhandidly, showing that the reason of illegality was not the reason why they were discharged but rather a political motive. This is chutzpa.[1]

### 3. *Remedy*

a) The Court finds that plaintiffs suffered demonstrable damages from their discharges and awards backpay in the amounts listed in the findings of fact for each respective plaintiff.

b) The Court finds that the defendant violated plaintiff's first and fourteenth amendment rights in dismissing them because of their political affiliation. The appropriate award here for compensatory damages resulting in the mental distress suffered by plaintiffs outlined in Findings of Fact numbers 50 and 51 is $10,000.00 per plaintiff. *See María M. Agosto de Feliciano v. Awilda Aponte Roque*, slip op. at 20 (1st Cir. August 14, 1987). However, Víctor Pedraza Rosario has not found employment, and the Court will, in its discretionary power, also grant the equitable relief of reinstatement for that plaintiff, as detailed below.

c) The Court hereby ORDERS defendant Franklin Martínez Monge, his officers, agents, employees and attorneys to immediately reinstate Víctor Pedraza Rosario to the position, with full duties, responsibilities and monthly salary which he had as of July 15, 1985, plus any salary increases that position has received, as described in Findings of Fact numbers 22 and 23, and which correspond to his career position as Driver, position number 397 in the Office of the Governor at the Office of General Services. Defendant is further ORDERED to immediately cease and desist from any

---

1. Chutzpa defined: There once was a man who murdered both his parents. He was tried and convicted of the offense. When it came time to be sentenced, the killer threw himself on the mercy of the court because he was an orphan. L. Rosten, *The Joys of Yiddish* 92.

and all politically motivated acts of discrimination against this Victor Pedraza Rosario.

d) Because the Court found that defendant's discrimination was willfull, reckless, malicious, callous, and with a cynical disregard for the civil rights of the plaintiffs, the Court awards each plaintiff $10,000.00 in punitive damages, to be paid by defendant Franklin Martínez Monge.

e) Finally, plaintiffs are entitled to attorneys' fees and costs pursuant to the express provision of 42 U.S.C. § 1988. Plaintiff's counsel shall file a verified fee and costs petition within thirty days of the date of entry of Judgment.

On the record we find that plaintiffs' dismissals were politically motivated, and judgment shall be entered accordingly.

This week we celebrate the Bicentennial of the signing of the United States Constitution. That Constitution, which is so much the subject of this Opinion, is a living Constitution. The facts of 1987, outlined in this Opinion, are spoken to directly by the Constitution of 1787 because it is that venerable document that oversees the relation of the citizen to the Government and ensures that the natural rights of the people are protected. Puerto Rico has lived and practiced the United States Constitution during close to half the Constitution's lifespan. The constitutional principles are so embedded in the consciousness of the people that they are part and parcel of their patrimony and culture. Our culture stands in contrast to that of other countries of the Americas where the experience of constitutional government has been nonexistent or sporadic.

The principles contained in the Constitution are immutable such that We the People may draw strength from our diverse society of all races, cultures, outlooks, religions, and, most importantly for the purposes of this Opinion, political persuasions. Our strength as a nation is precisely because of the coupling of our diversity with the *right* to be diverse without fear of oppression. The Government can never take that away from us in the face of the Constitution of the United States.

Such freedom, however, brings with it responsibility. "Eternal vigilance is the price of liberty," wrote Thomas Jefferson. Today, two hundred years later, we stand vigilant against oppression by the Government on account of our differing, even our unpopular, opinions.

IT IS SO ORDERED.